Filed 8/30/12

# IN THE SUPREME COURT OF CALIFORNIA

In re WILLIE CLIFFORD COLEY       )                         S185303
                                             )

           on Habeas Corpus.           )         Ct. App. 2/5 No. B224400
_____)

California's "Three Strikes" law applies to a criminal defendant who is currently charged and convicted of a felony and who has previously been convicted of one or more serious or violent felonies. One aspect of the law that has proven controversial is that the lengthy punishment prescribed by the law may be imposed not only when such a defendant is convicted of another serious or violent felony but also when he or she is convicted of any offense that is categorized under California law as a felony. This is so even when the current, so-called triggering, offense is nonviolent and may be widely perceived as relatively minor. (Pen. Code, §§ 667, subd. (c), 1170.12, subd. (a); see, e.g., *People v. Carmony* (2004) 33 Cal.4th 367, 381 (conc. opn. of Moreno, J., joined by Chin, J.) (*Carmony I*); Vitiello, *California's Three Strikes and We're Out: Was Judicial Activism California's Best Hope?* (2004) 37 U.C. Davis L.Rev. 1025, 1026 ["Widely reported Three Strikes cases have involved trivial offenses — such as the theft of a bicycle, a slice of pizza, cookies or a bottle of vitamins — that have resulted in severe sentences"].)

Shortly after the Three Strikes law was enacted, a number of federal appellate decisions held that the 25-year-to-life minimum sentence mandated by the law for a third-strike felony conviction constituted cruel and unusual punishment in violation of the Eighth Amendment of the federal Constitution

when imposed upon a defendant whose current felony offense was a comparatively minor, nonviolent offense.  (See, e.g., *Andrade v. Attorney General of State of California* (9th Cir. 2001) 270 F.3d 743; *Brown v. Mayle* (9th Cir. 2002) 283 F.3d 1019.)  The United States Supreme Court granted certiorari in each of those cases,[1] however, and in a related case, *Ewing v. California* (2003) 538 U.S. 11 (*Ewing*), the federal high court addressed a cruel and unusual punishment challenge to the imposition of a sentence of 25 years to life under California's Three Strikes law upon a defendant whose triggering offense was the nonviolent theft of three golf clubs worth a total of $1,200.  In *Ewing,* the high court concluded, in a five-to-four decision, that, in light of the antirecidivist purpose of the Three Strikes law and the defendant's criminal history, the sentence imposed upon the defendant in that case was not unconstitutional.  The lead opinion in *Ewing* (authored by Justice O'Connor), however, did not eliminate the possibility that some triggering offense, although designated a felony under California law, might be so minor and unrelated to the goal of deterring recidivism that a 25-year-to-life sentence would be "grossly disproportionate" and constitute cruel and unusual punishment under the Eighth Amendment, even when imposed upon a defendant with a serious criminal record.

Subsequently, in *People v. Carmony* (2005) 127 Cal.App.4th 1066 (*Carmony II*), a panel of the California Court of Appeal, Third Appellate District, concluded in a two-to-one decision that a 25-year-to-life sentence under the Three Strikes law constituted cruel and/or unusual punishment, in violation of the federal and state Constitutions, as applied to a defendant whose triggering offense was the

---

[1]     See *Lockyer v. Andrade* (2002) 535 U.S. 969, certiorari granted, reversed (2003) 538 U.S. 63; *Mayle v. Brown* (2003) 538 U.S. 901, certiorari granted, appellate court judgment vacated, remanded.

failure to annually update his sex offender registration within five working days of his birthday. The defendant in *Carmony II* had properly registered as a sex offender at his current address one month before his birthday, had continued to reside at the same address throughout the relevant period, had remained in contact with his parole agent, and was arrested at that same address by his parole agent one month after his birthday. Observing that "because defendant did not evade or intend to evade law enforcement officers, his offense was the most technical and harmless violation of the registration law we have seen" (127 Cal.App.4th at p. 1078), the majority opinion in *Carmony II* concluded that, notwithstanding the defendant's record of serious prior offenses, the imposition of a 25-year-to-life sentence was grossly disproportionate to the gravity of the defendant's offenses and violated the constitutional prohibition of cruel and/or unusual punishment. Thereafter, a three-judge panel of the United States Court of Appeals for the Ninth Circuit, addressing a cruel and unusual punishment claim in a factual setting very similar to that presented in *Carmony II*, reached the same conclusion as the California appellate court in *Carmony II*. (*Gonzalez v. Duncan* (9th Cir. 2008) 551 F.3d 875.)

In the present habeas corpus proceeding, a panel of the Court of Appeal, Second Appellate District, Division Five, considering the constitutionality of a 25-year-to-life sentence imposed upon a defendant who also was convicted of failing to update his sex offender registration within five working days of his birthday, expressly disagreed with the analysis and conclusion of the appellate court in *Carmony II* and held that the punishment was constitutionally permissible. In light of the conflict in the two Court of Appeal decisions, we granted review.

We agree with the Court of Appeal in the present case that imposition of a 25-year-to-life sentence upon petitioner in this matter does not constitute cruel and unusual punishment in violation of the federal Constitution, but, for the reasons

3

discussed more fully hereafter, we conclude that we need not and should not rest our holding upon a determination that the Court of Appeal opinion in *Carmony II* was wrongly decided. The conduct of petitioner in this case, as found by the trial court, is clearly distinguishable in a significant respect from the conduct of the defendant in *Carmony II*. Unlike the defendant in *Carmony II*, who had very recently registered at his current address and who the Court of Appeal found "did not evade or intend to evade law enforcement officers" (*Carmony II*, *supra*, 127 Cal.App.4th at p. 1078), the trial court in this case, in refusing to strike any of petitioner's prior convictions and in imposing a 25-year-to-life sentence under the Three Strikes law, found that petitioner's triggering offense was not simply a minor or technical oversight by a defendant who had made a good faith effort to comply with the sex offender registration law. Rather, the court found that petitioner had never registered as a sex offender at his current address and had knowingly and intentionally refused to comply with his obligations under the sex offender registration law.

Petitioner's conduct, as found by the trial court, demonstrated that, despite the significant punishment petitioner had incurred as a result of his prior serious offenses, he was still intentionally unwilling to comply with an important legal obligation, and thus his triggering criminal conduct bore both a rational and substantial relationship to the antirecidivist purposes of the Three Strikes law. Given that relationship and the extremely serious and heinous nature of petitioner's prior criminal history, we conclude that, under *Ewing*, *supra*, 538 U.S. 11, the imposition of a 25-year-to-life sentence does not constitute cruel and unusual punishment under the circumstances of this case. In light of the facts underlying the offense in this case as found by the trial court, we need not decide whether the Eighth Amendment prohibits the imposition of a 25-year-to-life sentence under the Three Strikes law in a factual situation like that in *Carmony II,*

4

in which a defendant had properly registered his current residential address and demonstrated a good faith attempt to comply with the sex offender registration law but due to a negligent oversight had failed to update his registration within five working days of his birthday.

## I. Facts and Proceedings Below

Prior to the commission of his latest offense, petitioner Willie Clifford Coley had a lengthy and very significant criminal history. In 1978, when he was 18 or 19 years old, petitioner was convicted of burglary in Florida and was sentenced to 15 years in state prison. He was released from prison in Florida in 1986, and thereafter moved to California. In 1988, petitioner was convicted in California of three serious and violent felony offenses — voluntary manslaughter (Pen. Code, § 192),[2] robbery (§ 211), and acting in concert to aid and abet the commission of rape (§ 264.1) — and was sentenced to 20 years in state prison.[3]

---

[2] Unless otherwise indicated, further statutory references are to the Penal Code.

[3] In its opinion below, the Court of Appeal described the circumstances relating to petitioner's 1988 offenses: "The facts underlying petitioner's manslaughter, rape, and robbery convictions bear mentioning as they are particularly callous. The manslaughter case arose out of a dispute between petitioner's roommate and a woman. Petitioner's roommate believed the woman had stolen some of the roommate's cocaine. The roommate struggled with the woman and called out to petitioner to lend assistance. Petitioner held the woman down as his roommate attempted to examine the woman's rectum and vagina for the missing cocaine. During the struggle, the woman was choked and fell unconscious. The two men tied an electrical cord around her hands, feet, and neck. Petitioner and his roommate went to sleep and, when they awoke, realized the woman was dead. Because she had defecated, they bathed her. The men cut the woman's fingernails in an attempt to destroy evidence under her fingernails (i.e., human skin) indicating she had scratched petitioner's roommate. After doing so, they moved the woman to an inoperable freezer where her body was stored.

"Four months after the killing, petitioner and his roommate committed rape and robbery. They entered a woman's residence at 3:00 a.m. while she was

*(footnote continued on next page)*

After having been released on parole and subsequently returned to prison for parole violations on three prior occasions,[4] petitioner was again released from prison on parole on January 7, 2001. As a result of his 1988 conviction of aiding and abetting rape, petitioner was required to register as a sex offender for the remainder of his life. (§ 290, subds. (b), (c).) In August 2001, petitioner was arrested and subsequently convicted of violating a provision of California's sex offender registration statutes and was sentenced to 25 years to life under the Three Strikes law. Petitioner challenges the constitutionality of this sentence in the present habeas corpus proceeding.

Because there is a dispute regarding the nature of petitioner's conduct underlying his most recent conviction — a dispute that bears directly upon the

---

*(footnote continued from previous page)*

sleeping. She was pulled from her bed, her hands were bound, and tape was placed across her mouth. Petitioner's roommate raped the woman while petitioner stood guard.

"Petitioner's roommate then ordered the woman to call another man and invite him to the residence. When the man arrived, petitioner's roommate invited him inside and took him to the bedroom where petitioner was keeping the woman. Petitioner's roommate put a knife to the man's throat, threatened to kill him, and took his wallet.

"The probation officer responsible for drafting the probation report prior to sentencing on these offenses wrote: 'It is absolutely incomprehensible to understand how [petitioner] and [his roommate] could continue living in an apartment with a body decomposing in a freezer and dripping fluid on the kitchen floor.' The probation officer indicated petitioner was 'a man without a conscience' and that petitioner 'show[ed] no remorse for his behavior and it is expected that he will re-involve himself in criminal behavior when he is released from State Prison.' He concluded, petitioner was 'an extreme danger to the community.' "

[4] Petitioner's prior parole violations were based on positive narcotics testing for cocaine, PCP, and methamphetamine, and on absconding from parole by traveling to Florida without notice to, or permission of, his parole officer.

cruel and unusual punishment claim before us — we describe in some detail the relevant evidence presented at trial as well as additional facts disclosed by the probation report and other documents that were before the trial court.

As noted, petitioner was released from prison on parole on January 7, 2001. Although required to do so, petitioner failed to contact his parole officer upon his release, and the former Board of Prison Terms promptly summarily suspended his parole on January 10, 2001. Petitioner's parole officer was unaware of petitioner's whereabouts, however, and petitioner was not immediately apprehended.

In addition to being required to contact his parole officer upon his release from prison, petitioner was required to register as a sex offender within five days of his release from prison. Evidence at trial indicated that the Department of Justice had no record that, after his release from prison on January 7, 2001, petitioner had registered as a sex offender at any location within the state.

In August 2001, law enforcement officers conducted a general "parole sweep" in the Lancaster/Palmdale area for parolees who were suspected of having outstanding parole violations. As part of the sweep, officers discovered that petitioner had recently filed a document with the Department of Motor Vehicles listing a residential address in the City of Palmdale. The officers went to the new address and arrested petitioner at that address on August 23, 2001.

The district attorney thereafter charged petitioner with two felony offenses: (1) failure to register as a sex offender upon arrival in a jurisdiction (§ 290, former subd. (a)(1)(A), now §§ 290, subd. (b), 290.013, 290.015) and (2) failure to update his sex offender registration within five working days of his birthday (which for petitioner fell on May 22, 2001) (§ 290, former subd. (a)(1)(D), now § 290.012).[5]

---

[5]     In 2007, Penal Code section 290 was repealed and reenacted as sections 290 to 290.023. (Stats. 2007, ch. 579, §§ 7-31.)

7

The information also alleged that petitioner had sustained three prior serious or violent felony convictions within the meaning of the Three Strikes law, bringing petitioner within the reach of the increased punishment prescribed by that law.

At trial, the prosecution presented a number of witnesses, as well as documentary evidence, establishing that petitioner had been personally and repeatedly advised of the sex offender registration requirements imposed by the sex offender registration statutes, including the obligation to register as a sex offender with the local sheriff's department within five days of arrival in a city, and, independently, the obligation to update the registration every year within five working days of his birthday.[6] The prosecution's evidence also established that after being released from prison in January 2001, petitioner had moved in with his girlfriend and her children who resided in the City of Palmdale and had continued to reside there until he was arrested in August 2001. As noted above, the prosecution also presented evidence that records from the Department of Justice indicated that petitioner had not registered as a sex offender or updated his sex offender registration after his release from prison in January 2001.

A clerk/technician employed by the Los Angeles County Sheriff's Department station in Palmdale testified that she was the only person who registered sex offenders at the Palmdale sheriff's department and had no record of

---

[6] Both petitioner's parole officer and a Lancaster sheriff's department clerk who first registered petitioner as a sex offender in October 1998 testified that they had expressly advised petitioner that he was required to update his registration within five days of his birthday every year, in addition to being required to register upon a change of address. The Lancaster clerk also testified that a registration form given to petitioner when he registered with her on April 12, 1999, explicitly stated that petitioner's next annual date for registration would be May 22, 1999, because his date of birth was May 22, 1959, and that she had specifically shown that item to petitioner.

8

having ever registered petitioner, that she was positive that she had not registered him, and that she did not believe that she had ever seen petitioner. On cross-examination, defense counsel questioned the quality of the technician's recordkeeping and computer skills, implying that she may have been mistaken regarding not having registered petitioner and may have failed properly to enter his registration in the department's computer database.

One of the law enforcement officers who arrested petitioner at his Palmdale residence in August 2001 testified that, at the time of his arrest, petitioner, after being advised of his constitutional rights, acknowledged that he had lived at that address in Palmdale since January 2001 and told the officer that he (petitioner) had failed to register or to contact his parole officer because "he wanted to try to get by through life without contact with the sheriff's department or parole." Another officer testified that he had found numerous personal papers of petitioner in the drawer of the nightstand in petitioner's bedroom, including a document from the Department of Motor Vehicles; the papers found in the drawer did not include any document indicating that petitioner had in fact registered as a sex offender at the Palmdale sheriff's department upon his release from prison.

Petitioner testified in his own defense. Petitioner acknowledged that he knew he was required to register as a sex offender upon his release from prison and testified that he had in fact registered as a sex offender on January 12, 2001, at the Palmdale sheriff's department, had received a receipt reflecting that registration, and had put the receipt in the drawer in his nightstand where "all my paperwork goes." In the course of his testimony, petitioner provided a description of the exterior and interior of the building housing the sheriff's department, identified the clerk/technician employed by the Palmdale sheriff's department who had testified for the prosecution as the individual who had handled his registration on January 12, 2001, and purported to describe the registration process. Petitioner

9

further testified that although he knew that he had to register when he was released from prison and when he moved, he believed that he only had to register once a year, and thought that because he had registered with the Palmdale sheriff's department in January 2001 he did not have to register again until his birthday the following year (that is, until May 2002); he admitted that he had not updated his registration within five days of his birthday in May 2001. On cross-examination, petitioner acknowledged that although he believed that the alleged receipt of his asserted January 12, 2001 sex offender registration at the Palmdale sheriff's department was in his nightstand drawer when he was arrested in August 2001, he had not informed the arresting officers that he had in fact registered as a sex offender in January 2001 or that a receipt reflecting that registration was in his nightstand drawer.

In rebuttal, the prosecution recalled the Palmdale clerk/technician who had testified earlier. The technician testified that petitioner's description of both the exterior and interior of the sheriff's department building was inaccurate in many very substantial respects, including the layout of the interior of the building and the size, shape, and layout of the room in which she worked and in which she registered sex offenders. The prosecution also recalled one of the arresting officers, who testified that although he informed petitioner that he was being arrested for failure to register as a sex offender, petitioner had not offered to provide any type of documentation to prove that he had in fact registered.

At the conclusion of the trial and after several hours of deliberation, the jury returned a verdict acquitting petitioner of the charge of failing to register upon

his arrival in the jurisdiction, but convicting him of failing to update his registration within five working days of his birthday.[7]

Prior to the sentencing hearing, petitioner admitted that he had been convicted of the three prior serious or violent felonies charged in the information (voluntary manslaughter, robbery, and aiding and abetting rape), and requested that the trial court, on its own motion, strike at least two of the prior convictions in the interest of justice. In support of that request, petitioner emphasized the assertedly minor and nonaggravated nature of the triggering offense of which he had been convicted, characterizing his current criminal conduct as a mere "nonact" and further arguing that, as applied to him, the punishment prescribed by the Three Strikes law would constitute cruel and unusual punishment.

In ruling upon the request to strike priors, the trial court, in addition to reviewing petitioner's lengthy and serious prior criminal record and noting that the offense in this case occurred only a few months after petitioner's release on parole, stated with regard to the facts of the current offense: "With respect to the defendant's testimony that he went down to the Palmdale station and registered,

---

**7**    In his opening brief, petitioner asserts that his failure to update his registration at the time of his birthday "arose from his confusion over having to register the same address twice during the same year." The jury was specifically instructed, however, that in order to prove this offense, the prosecution was obligated to prove, among other matters, that "[t]he defendant actually knew of his duty to update his registration on an annual basis, within five (5) working days of his birthday, with the local law enforcement agency in the city in which he resided . . . ." Thus, in convicting petitioner of this offense, the jury necessarily found beyond a reasonable doubt that defendant knew of his obligation to annually update his registration within five days of his birthday but failed to do so. (See *People v. Barker* (2004) 34 Cal.4th 345, 350-358 [holding that a violation of the sex offender registration statutes requires actual knowledge of the duty to register but that one may violate the statute simply by forgetting to register after having been advised of the duty to do so].)

and that for some reason the paperwork was lost or not completed, or the registrar failed to input his registration into the computer. I don't know if the jury accepted that testimony or not, *but the court did not believe that testimony for a moment.* So my review of evidence supports the fact that the only time that the defendant ever made an effort to register was either when he was in prison for a parole violation, or was taken to register by his parole agent. The defendant is well aware of his obligation to register. He had been told about it on a number of occasions. He is the one that chose to risk the sanctions for having failed to register." (Italics added.)

Finding that "[m]y review of the record indicates to me that [petitioner] has consistently refused to register as a sex offender," the trial court refused to strike any of petitioner's prior serious or violent felony convictions and sentenced defendant as a third strike defendant, imposing a 25-year-to-life sentence under the Three Strikes law.

In the course of its sentencing ruling, the trial court expressly distinguished the facts of petitioner's current offense from the facts involved in *People v. Cluff* (2001) 87 Cal.App.4th 991, a then recent Court of Appeal decision in which the appellate court concluded that the trial court had abused its discretion in refusing to strike prior convictions in a Three Strikes case in which the defendant's triggering offense was also a failure to update his sex registration within five days of his birthday. The trial court in the present case stated in this regard: "With respect to the Court of Appeal's decision in *People v. Cluff* . . . , I think that is an appropriate disposition under the facts of that case, but the facts of this case appear to me to be in stark contrast to those in the *Cluff* case, because in the *Cluff* case that defendant made previous efforts to register and did register on previous occasions."

On appeal, the appellate court affirmed petitioner's conviction and sentence, specifically rejecting claims that (1) the trial court had abused its discretion in failing to strike two prior serious or violent felony convictions and (2) that the 25-year-to-life sentence imposed upon petitioner constituted cruel and unusual punishment.  (*People v. Coley* (May 13, 2003, B158564) [nonpub. opn.], review den. July 23, 2003, S116799.)

Several years after the affirmance of petitioner's conviction and sentence became final, the Court of Appeal in *Carmony II*, *supra*, 127 Cal.App.4th 1066, concluded that the imposition of a 25-year-to-life sentence under the Three Strikes law upon a defendant who had been convicted of failing to annually update his sex registration within five days of his birthday violated the prohibition against cruel and/or unusual punishment contained in the federal and California Constitutions. We discuss the *Carmony II* decision below (*post*, at pp. 24-30).

Thereafter, petitioner filed the present habeas corpus proceeding, contending that, as in *Carmony II*, *supra*, 127 Cal.App.4th 1066, his 25-year-to-life sentence violated the prohibition on cruel and unusual punishment set forth in the Eighth Amendment of the United States Constitution.  Although, as noted, petitioner had raised an Eighth Amendment challenge to his sentence in his direct appeal and that claim had been rejected on appeal, and although a habeas corpus petition generally may not rely upon an issue that has been raised and rejected on appeal (see, e.g., *In re Waltreus* (1965) 62 Cal.2d 218, 225), California decisions have recognized an exception to this general rule in instances in which there has been a subsequent change in the law in petitioner's favor.  (See, e.g., *In re Harris* (1993) 5 Cal.4th 813, 841.)  Because the decision in *Carmony II* was decided after petitioner's appeal had become final, we determined that petitioner's Eighth Amendment claim was not procedurally barred, and we issued an order to show cause returnable before the Court of Appeal, with directions to consider the

13

question whether petitioner was entitled to relief in light of the decision in *Carmony II*.

After briefing and argument, the Court of Appeal addressed petitioner's Eighth Amendment claim on the merits, concluding that the Court of Appeal decision in *Carmony II*, *supra*, 127 Cal.App.4th 1066, was wrongly decided and that petitioner's 25-year-to-life sentence did not violate the Eighth Amendment of the federal Constitution. In light of the conflict between the Court of Appeal opinion in this case and the Court of Appeal decision in *Carmony II*, we granted review.[8]

## II. Review of Relevant United States Supreme Court Eighth Amendment Decisions

The Eighth Amendment of the United States Constitution provides in full: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

Although it has always been uniformly accepted that the federal cruel and unusual punishment clause prohibits the infliction of certain modes of punishment (for example, inherently barbaric punishments such as "punishments of torture"

---

[8] In his habeas corpus petition, petitioner contended only that his sentence violated the cruel and unusual punishment clause of the Eighth Amendment of the federal Constitution, and did not raise any claim under the California Constitution. As a consequence, the Court of Appeal expressly limited its decision to a ruling on the Eighth Amendment question, and the petition for review sought review only of that federal constitutional issue. Although in subsequent briefing in this court petitioner has argued that his sentence also violates the cruel or unusual punishment clause of the California Constitution, because the habeas corpus petition itself was limited to the federal constitutional issue and the Court of Appeal expressly confined its consideration and decision to that issue, we conclude that it is appropriate to limit our consideration and decision to the federal constitutional claim.

14

(see, e.g., *Wilkerson v. Utah* (1879) 99 U.S. 130, 136)), there has been some dispute, particularly outside the context of capital punishment, whether the provision also prohibits the imposition of punishment that is "excessive" or "disproportionate" in relation to the offense or offenses for which the punishment is imposed. Over the past two decades, several high court justices have expressed doubts whether the Eighth Amendment's cruel and unusual punishment clause was intended to grant courts *any* authority to evaluate the *length* of prison sentences enacted by legislative bodies to determine whether such sentences are excessive or disproportionate in light of the offense or offenses for which the sentences are imposed. (See *Harmelin v. Michigan* (1991) 501 U.S. 957, 962-994 [separate opn. of Scalia, J., joined in relevant part by Rehnquist, C.J.] (*Harmelin*); *Ewing*, *supra*, 538 U.S. at pp. 31-32 [conc. opn. of Scalia, J.]; *Ewing,* at p. 32 [conc. opn. of Thomas, J.].) A majority of the high court, however, has consistently rejected this limited view of the scope of the federal cruel and unusual punishment clause, and it is now firmly established that "[t]he concept of proportionality is central to the Eighth Amendment," and that "[e]mbodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' [Citation.]" (*Graham v. Florida* (2010) 560 U.S. ___, ___ [176 L.Ed.2d 825, 835] (*Graham*); see also *Solem v. Helm* (1983) 463 U.S. 277, 284-292 (*Solem*); *Harmelin*, *supra*, at pp. 996-1001, 997 [conc. opn. of Kennedy, J., joined by O'Connor and Souter, JJ.] [Eighth Amend. encompasses "a narrow proportionality principle" that "also applies to noncapital sentences"]; *Harmelin,* at pp. 1009-1021 [dis. opn. of White, J., joined by Blackmun and Stevens, JJ.]; *Harmelin,* at p. 1027 [dis. opn. of Marshall, J.]; *Ewing*, *supra*, at pp. 20-24 [lead opn. of O'Connor, J., joined by Rehnquist, C.J. and Kennedy, J.]; *Ewing,* at pp. 32-35 [dis. opn. of Stevens, J., joined by Souter, Ginsburg, and Breyer, JJ.].)

15

In past cases, the high court has addressed the claim that a sentence of imprisonment for a term of years is unconstitutionally excessive in a variety of contexts, but in view of the circumstances of the present case the most pertinent of the high court's past proportionality decisions are those that have considered the validity of lengthy terms of imprisonment imposed under "habitual offender" or recidivist sentencing provisions analogous to California's Three Strikes law. As we shall see, each of these cases was decided by a closely divided court and illustrates the particularly difficult nature of line drawing in this context.

In *Rummel v. Estelle* (1980) 445 U.S. 263 (*Rummel*), the initial case in this line of decisions, the defendant had been sentenced to a term of life in prison with the possibility of parole under a Texas statute that mandated a life sentence for any person convicted of a third felony offense. In *Rummel* itself, the defendant's triggering offense was a conviction for "felony theft," based upon the defendant's conduct of "obtaining $120.75 by false pretenses." (445 U.S. at p. 266.) The defendant had two prior felony convictions, the first for "fraudulent use of a credit card to obtain $80 worth of goods or services" (*id.* at p. 265) and the second for "passing a forged check in the amount of $28.36." (*Ibid.*) In a five-to-four decision, the court in *Rummel* rejected the defendant's contention that a sentence of life imprisonment with the possibility of parole constituted cruel and unusual punishment as applied to the circumstances of his case. In response to a criticism advanced by the dissenting opinion in that case, the court in *Rummel* acknowledged that a sentence for a term of years might be unconstitutionally disproportionate in a very extreme case — for example, "if a legislature made overtime parking a felony punishable by life imprisonment" (445 U.S. at p. 274, fn. 11) — but the court concluded that the facts before it did not constitute such an extreme case. The court held that "[h]aving twice imprisoned him for felonies, Texas was entitled to place upon Rummel the onus of one who is simply unable to

16

bring his conduct within the social norms prescribed by the criminal law of the State." (*Id.* at p. 284.)

In *Rummel*, four justices dissented in an opinion authored by Justice Powell. (*Rummel*, *supra*, 445 U.S. at pp. 285-307.) The dissent emphasized that each of the defendant's felony convictions was for a nonviolent theft offense and that in total defendant had unlawfully defrauded others of only $230. The dissent concluded that "[t]he sentence imposed upon the petitioner would be viewed as grossly unjust by virtually every layman and lawyer" and that "objective criteria clearly establish that a mandatory life sentence for defrauding persons of about $230 crosses any rationally drawn line separating punishment that lawfully may be imposed from that which is proscribed by the Eighth Amendment." (445 U.S. at p. 307 (dis. opn. of Powell, J.).)

Just three years after the decision in *Rummel*, *supra*, 445 U.S. 263, the United States Supreme Court, with Justice Powell now writing for a five-judge majority, reached a contrary conclusion in *Solem*, *supra*, 463 U.S. 277. In *Solem*, the defendant had a prior criminal record of relatively minor, nonviolent crimes and was convicted in the current prosecution of a felony offense for "uttering a 'no account' check for $100." (463 U.S. at p. 281.) In *Solem*, however, the triggering offense was the defendant's *seventh* felony conviction, and the trial court sentenced him under South Dakota's recidivist sentencing provision to a term of life imprisonment, a term which, under South Dakota law, was not subject to parole.

In analyzing whether the defendant's sentence violated the prohibition on cruel and unusual punishment set forth in the Eighth Amendment, the court in *Solem* first reviewed the history of the Eighth Amendment and concluded "as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convicted." (*Solem*, *supra*, 463 U.S. at p. 290.) At

17

the same time, the court in *Solem* cautioned that "[r]eviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals" (*ibid.*), and further emphasized that "a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." (*Solem, supra,* at p. 292.) Reviewing the sentence in question under these criteria, the majority in *Solem* determined (1) that the defendant's triggering offense "was 'one of the most passive felonies a person could commit' " (*id.* at p. 296), (2) that "[h]is prior offenses, although classified as felonies, were all relatively minor [and] nonviolent" (*id.* at pp. 296-297), (3) that his sentence — life without the possibility of parole — was "far more severe" than the sentence considered in *Rummel* (*Solem, supra,* at p. 297) and was the same sentence that South Dakota imposed for much more serious offenses and upon much more culpable habitual offenders (*id.* at pp. 298-299), and, finally, (4) that it appeared that the defendant's sentence was more severe than the sentence that would have been imposed upon a similarly situated defendant in any other state. (*Id.* at pp. 299-300.) Under these circumstances, the court in *Solem* concluded that the defendant's sentence "is significantly disproportionate to his crime, and is therefore prohibited by the Eighth Amendment." (*Id.* at p. 303.) The court in *Solem*, however, did not purport to overrule *Rummel*, expressly noting that the facts before it were distinguishable from *Rummel* because "[w]hereas Rummel was eligible for a reasonably early parole, Helm, at age 36, was sentenced to life with no possibility of parole." (*Solem, supra,* at p. 303, fn. 32.)

18

Four justices dissented in *Solem*, concluding that the majority opinion in that case was irreconcilable with the reasoning and conclusion in *Rummel*. Although the dissent acknowledged "that in extraordinary cases — such as a life sentence for overtime parking — it might be permissible for a court to decide whether the sentence is grossly disproportionate to the crime" (*Solem, supra,* 463 U.S. at p. 311, fn. 3 (dis. opn. of Burger, C.J.)), it concluded that given the defendant's lengthy criminal history the sentence imposed in *Solem* did not reflect "such an extraordinary case that reasonable men could not differ about the appropriateness of this punishment." (*Ibid.*)

In 2003, 20 years after the decision in *Solem*, the Supreme Court next addressed a cruel and unusual punishment challenge to a sentence imposed under a recidivist sentencing statute in *Ewing*, *supra*, 538 U.S. 11 — a case that, as we have already noted, arose under California's Three Strikes law. In *Ewing*, the defendant had a lengthy prior criminal history that included one conviction of robbery (in which the defendant had threatened a victim with a knife) as well as numerous convictions for burglary, theft, and unlawful possession of drug paraphernalia and a firearm. (See 538 U.S. at pp. 18-19.) After serving several years in prison, the defendant in *Ewing* was paroled in 1999. Ten months later, he stole three golf clubs, each priced at $399, from a pro shop at a golf course, walking out of the shop with the clubs concealed in his pants leg. An employee who saw him limp out of the shop telephoned the police and the defendant was apprehended shortly thereafter in the golf course parking lot.

In response to his most recent offense, the prosecution charged the defendant in *Ewing* under the Three Strikes law, alleging that the defendant had previously been convicted of four serious or violent felonies (robbery and three burglaries) and seeking the 25-year-to-life sentence authorized by the Three Strikes law. After being convicted of one count of felony grand theft — an

19

offense treated as a "wobbler" under California law (that is, an offense that may be punished as either a felony or a misdemeanor) — based on his theft of the three golf clubs, the defendant asked the trial court to reduce the grand theft conviction to a misdemeanor or, alternatively, to strike some or all of his prior convictions, so as to avoid a third strike sentence. The trial court declined to reduce the grand theft conviction to a misdemeanor or to strike any of the prior serious or violent felony convictions, and sentenced the defendant to the 25-year-to-life sentence authorized by the Three Strikes law.

On appeal, the defendant in *Ewing* contended that imposition of a 25-year-to-life sentence for a conviction based on the nonviolent theft of three golf clubs constituted cruel and unusual punishment in violation of the Eighth Amendment. After the California Court of Appeal rejected the contention and affirmed the conviction and sentence and this court denied a petition for review, the United States Supreme Court granted certiorari and ultimately rejected defendant's cruel and unusual punishment claim by a five-to-four vote.

In *Ewing*, the lead opinion, authored by Justice O'Connor (and joined by Rehnquist, C.J. and Kennedy, J.), after briefly reviewing the decisions in *Rummel*, *Solem*, and two other decisions that addressed cruel and unusual punishment challenges to lengthy noncapital sentences that had been imposed outside the antirecidivist context (see *Hutto v. Davis* (1982) 454 U.S. 370 [rejecting Eighth Amend. challenge to 40-year sentence for distributing a small quantity of marijuana]; *Harmelin*, *supra*, 501 U.S. 957 [rejecting Eighth Amend. challenge to life-without-parole sentence for possessing over 650 gm. (1.5 lb.) cocaine]), proceeded to analyze the merits of the cruel and unusual punishment claim in *Ewing* using the approach that had been articulated and applied by Justice Kennedy in his concurring opinion in *Harmelin*. (See *Harmelin*, *supra*, at pp. 996-1005 (conc. opn. of Kennedy, J.).) As described in the high court's more

20

recent proportionality decision in *Graham*, *supra*, 176 L.Ed.2d 825, Justice Kennedy's concurring opinion in *Harmelin* had synthesized the court's prior decisions in this realm as embodying the general rule "that the Eighth Amendment contains a 'narrow proportionality principle,' that 'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are "grossly disproportionate" to the crime.' " (*Graham*, *supra*, 176 L.Ed.2d at p. 836.) Justice Kennedy's concurring opinion in *Harmelin* further went on to explain how that principle is to be applied. As summarized in *Graham*, under the approach set forth in the *Harmelin* concurrence, "[a] court must begin by comparing the gravity of the offense and severity of the sentence. [Citation.] '[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [Citation.] If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual. [Citation.]" (*Graham*, *supra*, at p. 836.)

Applying this analysis in *Ewing*, Justice O'Connor's opinion turned first to an evaluation of the gravity of the defendant's offense compared to the severity of the penalty. (*Ewing*, *supra*, 538 U.S. at p. 28.) The opinion initially observed that "[e]ven standing alone, Ewing's theft" of nearly $1,200 worth of merchandise "should not be taken lightly. His crime was certainly not 'one of the most passive felonies a person could commit.' " (*Ibid*.) The opinion further emphasized, however, that "[i]n weighing the gravity of Ewing's offense, we must place on the scales not only his current felony, but also his long history of felony recidivism. Any other approach would fail to accord proper deference to the policy judgments that find expression in the legislature's choice of sanctions. In imposing a three

21

strikes sentence, the State's interest is not merely punishing the offense of conviction, or the 'triggering' offense: '[I]t is in addition the interest . . . in dealing in a harsher manner *with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law.*' " (*Id.* at p. 29, italics added.)

Although Justice O'Connor's opinion in *Ewing* recognized that the 25-year-to-life sentence imposed upon Ewing "is a long one" (*Ewing*, *supra*, 538 U.S. at p. 30), the opinion concluded that the sentence was justified "by the State's public-safety interest in incapacitating and deterring recidivist felons, and amply supported by [Ewing's] own long, serious criminal record." (*Id.* at pp. 29-30.) The opinion explained that Ewing's sentence "reflects a rational legislative judgment, entitled to deference, that offenders who have committed serious or violent felonies and who continue to commit felonies must be incapacitated. The State of California 'was entitled to place upon [Ewing] the onus of one who is simply unable to bring his conduct within the social norms prescribed by the criminal law of the State.' " (*Id.* at p. 30, quoting *Rummel*, *supra*, 445 U.S. at p. 284.)

Determining that "Ewing's is not 'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality' " (*Ewing*, *supra*, 538 U.S. at p. 30), Justice O'Connor's opinion concluded, "Ewing's sentence of 25 years to life in prison, imposed for the offense of felony grand theft under the three strikes law . . . does not violate the Eighth Amendment's prohibition on cruel and unusual punishments." (*Id.* at pp. 30-31.)

In *Ewing*, two justices — Justices Scalia and Thomas — each wrote a separate concurring opinion, both agreeing that Ewing's sentence did not violate the Eighth Amendment but basing their concurrence in the judgment on the view

22

that the Eighth Amendment contains no proportionality principle at all. (See *Ewing*, *supra*, 538 U.S. at pp. 31-32 (conc. opn. of Scalia, J.); *id.* at p. 32 (conc. opn. of Thomas, J.).) The three justices who signed Justice O'Connor's opinion and the two concurring justices comprised the five-justice majority in *Ewing*.

Four justices dissented in *Ewing*. Like Justice O'Connor's opinion, the dissenting opinion by Justice Breyer, joined by Justices Stevens, Souter, and Ginsburg, applied the analytical framework set forth in Justice Kennedy's concurring opinion in *Harmelin* (*Ewing*, *supra*, 538 U.S. at p. 36 (dis. opn. of Breyer, J.)),[9] but unlike the lead opinion the dissent, in applying that approach, concluded that the case before it did constitute one of the rare cases "in which a court can say with reasonable confidence that the punishment is 'grossly disproportionate' to the crime." (*Ewing*, *supra*, 538 U.S. at p. 37 (dis. opn. of Breyer, J.).) In reaching that conclusion, the dissent, after considering the "[t]hree kinds of sentence-related characteristics" that it believed "define the relevant comparative spectrum" — "(a) the length of the prison term in real time, *i.e.*, the time that the offender is likely actually to spend in prison; (b) the sentence-triggering criminal conduct, *i.e.,* the offender's actual behavior or other offense-related circumstances; and (c) the offender's criminal history" (*id.* at p. 37) —

---

[9]    Justice Breyer's dissenting opinion noted that "for present purposes" it was applying Justice Kennedy's analytical framework in *Harmelin*. (*Ewing, supra,* 538 U.S. at p. 36.) In a brief separate dissenting opinion, joined by Justices Souter, Ginsburg and Breyer, Justice Stevens observed that, while he agreed with Justice Breyer that Ewing's sentence was grossly disproportionate even under *Harmelin'*s narrow proportionality framework, "it is not clear that this case is controlled by *Harmelin*, which considered the proportionality of a life sentence imposed on a drug offender who had *no* prior felony convictions. Rather, the three-factor analysis established in *Solem v. Helm*, 463 U.S. 277, 290-291 (1983), which specifically addressed recidivist sentencing, seems more directly on point." (438 U.S. at p. 32, fn. 1 (dis. opn. of Stevens, J.).)

23

determined that the circumstances presented in *Ewing* fell between the circumstances presented in the court's previous recidivist sentencing decisions in *Rummel* and *Solem*, and ultimately found that, as in *Solem*, "Ewing's sentence (life imprisonment with a minimum term of 25 years) is grossly disproportionate to the triggering offense conduct — stealing three golf clubs — Ewing's recidivism notwithstanding." (*Ewing, supra,* at p. 53 (dis. opn. of Breyer, J.).)[10]

### III. Review of Relevant Post-*Ewing* Decisions

### A. *Carmony II*

Two years after the United States Supreme Court's decision in *Ewing*, *supra*, 538 U.S. 11, a panel of the California Court of Appeal was faced with the

---

[10]  In *Lockyer v. Andrade* (2003) 538 U.S. 63 (*Andrade*) — a companion case to *Ewing* — the Supreme Court, in another five-to-four decision, reversed a decision of the Ninth Circuit which had overturned a decision of the California Court of Appeal upholding the imposition of two consecutive 25-year-to-life sentences under California's Three Strikes law upon a defendant whose triggering felony convictions were each for petty theft with a prior arising from the defendant's theft of videotapes from two Kmart stores on two occasions. Although the majority in *Andrade* found that it was " 'clearly established' " under prior Supreme Court precedent that "[a] gross disproportionality principle is applicable to sentences for terms of years" (538 U.S. at p. 72), it concluded that "it was not an unreasonable application of our clearly established law for the California Court of Appeal to affirm Andrade's sentence of two consecutive terms of 25 years to life in prison." (*Id.* at p. 77.)

The four justices who dissented in *Ewing* also dissented in *Andrade*, joining in a dissenting opinion authored by Justice Souter. (*Andrade, supra,* 538 U.S. at pp. 77-83.) Justice Souter reasoned that whether or not one accepts the state's judgment that 25 years of incapacitation prior to parole eligibility is appropriate when a defendant with two serious or violent felony convictions commits another felony, "that policy cannot reasonably justify the imposition of a consecutive 25-year minimum for a second minor felony committed soon after the first triggering offense. . . . [T]he argument that repeating a trivial crime justifies doubling a 25-year minimum incapacitation sentence based on a threat to the public does not raise a seriously debatable point on which judgments might reasonably differ." (*Id.* at pp. 81-82 (dis. opn. of Souter, J.).)

---

question whether a 25-year-to-life sentence under the Three Strikes law violated either the federal constitutional prohibition on cruel and unusual punishments or the state constitutional prohibition on cruel or unusual punishment, when imposed upon a defendant whose triggering offense was the failure to update his sex offender registration within five working days of his birthday. (*Carmony II*, *supra*, 127 Cal.App.4th 1066.)

Keith Carmony, the defendant in *Carmony II*, had been convicted in 1983 of oral copulation by force or fear with a minor under the age of 14 years and as a consequence was required to register as a sex offender. Upon his release from prison on September 16, 1999, Carmony promptly registered as a sex offender as required by law. A week later, on September 23, 1999, after moving to a new residence, Carmony registered again, informing the authorities of his new address. Carmony's birthday fell on October 22 — the following month — and although his parole officer reminded him that he was required to update his registration annually within five working days of his birthday, Carmony — who continued to reside at the same address — forgot to reregister within five days of his birthday. On November 23, 1999, a month after Carmony's birthday, Carmony's parole officer went to Carmony's registered residential address and arrested him there for failing to comply with the annual registration requirement.

The Court of Appeal in *Carmony II* pointed out that "[d]efendant had recently married, maintained a residence, participated in Alcoholics Anonymous, sought job training and placement, and was employed. Just prior to the current offense, he worked as a forklift operator for Hartsell Trucking in Redding and was employed by them until November 24, 1999, the day following his arrest for the present offense." (127 Cal.App.4th at p. 1073.)

In response to the current charge, Carmony admitted that he had failed to reregister within five working days of his birthday and pled guilty to that offense.

He also admitted that he had previously been convicted of three serious or violent felonies, but requested that the trial court strike at least two of those prior convictions to avoid a mandatory 25-year-to-life sentence under the Three Strikes law. The trial court declined to strike any of the prior convictions and sentenced him to a 25-year-to-life sentence under the Three Strikes law.[11]

On appeal, the Court of Appeal had initially concluded that the trial court had abused the discretion afforded by the Three Strikes law in refusing to strike any of his prior convictions in the interest of justice (see *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497) and reversed the sentence on that basis; as a consequence, the appellate court did not reach the question whether the 25-year-to-life sentence constituted cruel and/or unusual punishment. We granted review. After first concluding that a trial court's refusal to strike a prior under the Three Strikes law is properly reviewable under an abuse of discretion standard (*Carmony I*, *supra*, 33 Cal.4th at pp. 373-376), this court held that in light of Carmony's prior record, the Court of Appeal had erred in finding that the trial court had abused its discretion in refusing to strike the prior convictions in that case. (33 Cal.4th at pp. 376-380.) At the same time, our opinion explicitly noted that "[w]e do not . . . address the issue of whether the sentence violates the constitutional guarantees against cruel and/or unusual punishment or double jeopardy, and leave the resolution of this issue for the Court of Appeal on remand." (*Id*. at p. 380, fn. 6.)[12]

---

[11]     Carmony also admitted that he had suffered a prior prison term, and the trial court sentenced him to an additional one year term for the prior prison term, resulting in an aggregate term of imprisonment of 26 years to life.

[12]     In *Carmony I* (in which the majority opinion was authored by Brown, J.), Justice Moreno authored a concurring opinion, joined by Justice Chin. (*Carmony I*, *supra*, 33 Cal.4th at pp. 380-381.) Although agreeing that the trial court had not abused its discretion under section 1385 in failing to strike at least two prior convictions, the concurring opinion observed that "it is difficult to escape the

*(footnote continued on next page)*

On remand, the Court of Appeal addressed the constitutional issue in its decision in *Carmony II*, *supra*, 127 Cal.App.4th 1066, and concluded, in a two-to-one decision, that, under the circumstances of that case, the 25-year-to-life sentence imposed under the Three Strikes law violated both the federal Constitution's prohibition of cruel and unusual punishments and the state Constitution's prohibition of cruel or unusual punishment. (*Carmony II, supra,* at pp. 1074-1989.)

In addressing the federal constitutional question through application of the approach endorsed by the lead opinion in *Ewing*, *supra*, 538 U.S 11, the court in *Carmony II* first discussed the relative gravity of the defendant's triggering offense. The court observed in this regard: "While a violation of section 290 [the sex offender registration provision] is classified as a felony, the instant offense was a passive, nonviolent, regulatory offense that posed no direct or immediate danger to society. Defendant committed this offense by violating the annual registration requirement . . . , having correctly registered the proper information the month before. Obviously, no change had occurred in the intervening period and defendant's parole agent was aware of this fact. Thus, because defendant did not evade or intend to evade law enforcement officers, his offense was the most

---

*(footnote continued from previous page)*

conclusion that the electorate that enacted the Three Strikes law did not intend to impose a life sentence on someone whose last offense was a technical violation of the sex offender registration statute — failing to register within five days of his birthday although he had registered a month earlier and had not changed his address since then — that posed no danger to the public. . . . [Citation.] Subject to the caveat that the sentence may yet be overturned on constitutional grounds, I reluctantly concur in the majority opinion." (33 Cal.4th at p. 381 (conc. opn. of Moreno, J.).)

technical and harmless violation of the registration law we have seen." (*Carmony II, supra,* 127 Cal.App.4th at p. 1078.)

After reviewing the legislative history of the specific provision imposing the annual registration requirement, the court in *Carmony II* explained that "the available legislative history suggests the annual registration requirement was intended to address the problem of offenders who fail to notify authorities of an address change because they are no longer under active parole supervision. Although this requirement serves a legitimate purpose, it is nevertheless a backup measure to ensure that authorities have current accurate information. In this case, when defendant failed to register within five days of his birthday, he was still on parole, had recently updated his registration, had not moved or changed any other required registration information during the one month since he registered, and was in contact with his parole officer. Therefore, his failure to register was completely harmless and no worse than a breach of an overtime parking ordinance." (*Carmony II, supra,* 127 Cal.App.4th at p. 1079.)[13]

The majority in *Carmony II* then considered the severity of the sentence that had been imposed upon the defendant, noting that the defendant "was sentenced to a term of 25 years to life in prison" and that "[i]n real terms, [the

---

**13** In the course of its opinion, the majority in *Carmony II* distinguished the prior Court of Appeal decision in *People v. Meeks* (2004) 123 Cal.App.4th 695, which had upheld a 25-year-to-life sentence under the Three Strikes law imposed upon a defendant whose triggering offense was a willful failure to register within five working days of an address change. The court in *Carmony II* noted that "the offense committed by Meeks was not the technical violation committed by [Carmony]. Meeks failed to register after changing his residence and therefore, unlike in the present case, law enforcement authorities did not have Meeks's correct address and information." (*Carmony II*, *supra*, 127 Cal.App.4th at p. 1082, fn. 11.)

28

defendant] must serve 25 years in prison before he is eligible for parole." (*Carmony II, supra,* 127 Cal.App.4th at p. 1079.) The court stated that "[i]t is beyond dispute that a life sentence is grossly disproportionate to the offense just described." (*Ibid.*)

The court in *Carmony II* recognized that in determining the validity of the sentence under the Eighth Amendment it must take into consideration that the defendant was a repeat offender whom the Legislature may punish more severely than it punishes a first-time offender. The majority opinion in *Carmony II* reasoned, however, that because "the double jeopardy clause prohibits successive punishment for the same offense," the "policy of the clause . . . circumscribes the relevance of recidivism," and "[t]o the extent the 'punishment greatly exceeds that warranted by the [triggering] offense, it begins to look very much as if the offender is actually being punished again for his prior offenses.' " (*Carmony II, supra,* 127 Cal.App.4th at p. 1080.) The majority in *Carmony II* found that "[g]iven the minimal and completely harmless nature of defendant's [triggering] offense and the relatively light penalty prescribed for a simple violation of the registration requirements, defendant's prior serious and violent felonies almost wholly account for the extreme penalty imposed on defendant." (*Ibid.*) Furthermore, because in the appellate court's view the defendant's triggering offense in that case "reveals no tendency to commit additional offenses that pose a threat to public safety" (*id.* at p. 1081), the court concluded that "a prison term of 25 years to life is grossly disproportionate to the gravity of the duplicate registration offense" (*ibid.*) even taking into account the defendant's multiple serious prior convictions. The court in *Carmony II* then compared the defendant's sentence with the sentences available for other offenses within California and for the sentences imposed under comparable circumstances in other states (*id.* at pp. 1081-1084), and ultimately concluded that "this case is one of those rare cases

29

in which the harshness of the Three Strikes sentence is grossly disproportionate to the gravity of the predicate offense . . . and violates the cruel and unusual punishment clause of the United States Constitution." (*Id.* at p. 1084.)[14] This court denied a petition for review, with Justices Kennard and Baxter voting to grant review.

### B. *Gonzalez v. Duncan*

Three years after the *Carmony II* decision, a similar cruel and unusual punishment claim came before the federal Court of Appeals for the Ninth Circuit in *Gonzalez v. Duncan*, *supra*, 551 F.3d 875. As in *Carmony II*, the defendant in *Gonzalez* had previously been convicted of a number of serious and violent felonies,[15] but the defendant's triggering offense that had resulted in a 25-year-to-

---

[14] In *Carmony II*, one Court of Appeal justice dissented from the determination that the defendant's sentence violated the Eighth Amendment. (*Carmony II, supra,* 127 Cal.App.4th at pp. 1089-1092 (conc. & dis. opn. of Nicholson, J.).) The dissenting justice disagreed with the majority's characterization of the defendant's current offense as a harmless technical violation of a regulatory law, observing, "Once we catch a person who has failed to register, we know where he is. That is fortunate, but it does not justify the violation of an important public safety statute. We rightly place strict requirements on sex offenders so we can keep tabs on them. [¶] . . . [¶] . . . While it was fortuitous that defendant was found where he had last registered, the requirement to register at continuing intervals is rational and supported by the policy discussed above." (*Carmony II, supra,* 127 Cal.App.4th at p. 1091.) The dissenting justice also disagreed with the majority's view that the primary focus should be placed upon the defendant's current offense, explaining that "[h]ere, defendant committed the felony of failing to register after having been convicted of two violent or serious felonies. That is the relevant set of circumstances that must bear the weight of the penalty imposed." (*Ibid.*)

[15] The defendant in *Gonzalez* had previously been convicted of committing (1) a lewd act with a child under 14, (2) attempted rape by force, and (3) second-degree robbery. (*Gonzalez, supra,* 551 F.3d at p. 878.)

life sentence under the Three Strikes law was a conviction of failing to update his sex offender registration within five working days of his birthday.

In analyzing the gravity of the defendant's offense in accordance with the controlling constitutional principles set forth by the United States Supreme Court in *Ewing*, *supra*, 538 U.S. 11, and *Andrade*, *supra*, 538 U.S. 63, the court in *Gonzalez* embraced the *Carmony II* court's characterization of the annual registration requirement as "merely a 'backup measure to ensure that authorities have current accurate information' " and of a failure to comply with that requirement as " 'the most technical violation of the section 290 registration requirement.' " (*Gonzalez, supra,* 551 F.3d at p. 884.)  The court in *Gonzalez* then stated:  "Indeed, we are unable to discern any actual harm resulting from Gonzalez's failure to comply with the annual registration requirement.  Gonzalez updated his sex offender registration nine months before and three months after his February 24, 2001, birthday, and he remained at his last registered address throughout that time period.  There is nothing in the record remotely indicating that Gonzalez's failure to reregister the same address a third time in the same twelve month period could have interfered with the ability of police to monitor his activities.  The record confirms that Gonzalez was in fact 'readily available for police surveillance':  Gonzalez was arrested 'fairly close' to his registered address, and the arresting officers were familiar with Gonzalez and had spoken to him previously at that location. . . .  We conclude that '[t]he purpose of the registration statute was not undermined by [Gonzalez's] failure to annually update his registration.' " (*Id.* at pp. 884-885, fn. omitted.)

The court in *Gonzalez* recognized that "California has a valid 'public-safety interest in incapacitating and deterring recidivist felons' " (*Gonzalez, supra,* 551 F.3d at p. 886) and that, under *Ewing*, *supra*, 538 U.S. 11, it was required to consider the defendant's criminal history in determining the validity of the

31

defendant's sentence for Eighth Amendment purposes. Further, the court in *Gonzalez* acknowledged that "Gonzalez's criminal history is extensive" and that "[his] prior convictions, which include both crimes of violence and sexual predation, are very serious." (*Gonzalez, supra,* at p. 886.)

The court in *Gonzalez* explained, however, that "we are unable to discern any rational relationship between Gonzalez's failure to update his sex offender registration annually and the probability that he will recidivate as a violent criminal or sex offender. . . . [¶] Gonzalez's present offense does not reveal any propensity to recidivate. California certainly may be 'justified in punishing a recidivist more severely than it punishes a first offender,' [citation], where ' "the latest crime . . . is considered to be an aggravated offense because [it is] a repetitive one," ' [citation]. However, what California has done here is fundamentally different. It has imposed an extraordinarily harsh sentence on Gonzalez based on a violation of a technical regulatory requirement that resulted in no social harm and to which little or no moral culpability attaches. Absent some connection between Gonzalez's past violent and sexual offenses, his present regulatory violation, and his propensity to recidivate as a violent or sexual offender, we cannot conclude that California's interest in deterring and incapacitating recidivist offenders justifies the severity of the indeterminate life sentence imposed." (*Gonzalez, supra,* 551 F.3d at p. 887.)

Concluding, for the foregoing reasons, that Gonzalez's sentence "raises an inference of gross disproportionality" (*Gonzalez, supra*, 551 F.3d at p. 887), the court in *Gonzalez* went on to undertake a comparison of Gonzalez's sentence with the sentences imposed for other crimes in California and for the same crime in other states. (*Id*. at pp. 887-888.) After conducting that comparison, the court found that it confirmed the view that Gonzalez's sentence was grossly disproportionate and thus violated the Eighth Amendment. (*Id*. at p. 889; see also

*Bradshaw v. State* (Ga. 2008) 671 S.E.2d 485, 488-493 [mandatory sentence of life imprisonment imposed under a recidivist sentencing provision for failure to comply with sex offender registration requirement constitutes cruel and unusual punishment in violation of the Eighth Amend. as applied to a defendant whose conduct reflected a good faith effort to comply with the requirement and no intent to evade detection].)

### C. *People v. Nichols*

One year after the decision in *Gonzalez* and four years after the decision in *Carmony II*, in the case of *People v. Nichols* (2009) 176 Cal.App.4th 428 (*Nichols*), another panel of the Court of Appeal, Third Appellate District (the same district that had decided *Carmony II*), faced the constitutionality of a third strike sentence imposed for another sex offender registration claim. The triggering offense in *Nichols* was the defendant's failure to comply with the distinct provision of the sex offender registration statute requiring a sex offender to register a new address within five working days of a change of residence. The defendant contended that the decision in *Carmony II* required the appellate court to find that the 25-year-to-life sentence imposed by the trial court in that case constituted cruel and unusual punishment in violation of the Eighth Amendment.

The court in *Nichols* emphatically rejected the defendant's contention, pointing out that "[t]he *Carmony II* court distinguished the seriousness of the registration offense before it with the one before the [court in *People v. Meeks*, *supra*, 123 Cal.App.4th 695]. The *Carmony II* court noted 'the offense committed by Meeks was not the technical violation committed by defendant. Meeks failed to register after changing his residence and therefore, unlike in the present case, law enforcement authorities did not have Meeks's correct address and information.' " (*Nichols*, *supra*, 176 Cal.App.4th at p. 436, quoting *Carmony II, supra,* 127 Cal.App.4th at p. 1082, fn. 1.) The court in *Nichols* continued: "It is

33

this distinction that supports the sentence given in this case. Unlike the failure in *Carmony II*, defendant's failure to register thwarted the fundamental purpose of the registration law, thereby leaving the public at risk. 'The purpose of the sex offender registration law is to require that the offender identify his present address to law enforcement authorities so that he or she is readily available for police surveillance.' " (*Nichols*, *supra*, 176 Cal.App.4th at p. 437, quoting *Carmony II, supra,* at p. 1072.)

Reviewing the facts presented in the *Nichols* case, the court stated: "Here, for a period of over eight months, defendant's whereabouts were unknown. Even his federal parole officer did not know where he was. . . . Such blatant disregard of the registration act and complete undercutting of the act's purposes is a serious offense." (*Nichols, supra,* 176 Cal.App.4th at p. 437.) "Defendant's failure to register when he left Rocklin and his thwarting the purpose of the registration act of being able to be located, coupled with the seriousness of his prior convictions and his sustained criminality, all demonstrate his sentence was not grossly disproportionate to his offense." (*Ibid.*)

### D. *Crosby v. Schwartz*

Most recently, in *Crosby v. Schwartz* (9th Cir. 2012) 678 F.3d 784 (*Crosby*), another three-judge panel of the Ninth Circuit rejected a habeas corpus petitioner's contention that the 26-year-to-life sentence imposed upon him under the Three Strikes law violated the Eighth Amendment. In that case, the petitioner had been convicted of both failing to annually update his sex offender registration within five days of his birthday and of failing to register within five days of a change of address, and the court, in rejecting the cruel and unusual punishment claim, emphasized that unlike the circumstances in the prior Ninth Circuit decision in *Gonzalez*, *supra*, 551 F.3d 875, the petitioner in *Crosby* had not committed "a

34

mere technical offense" but rather had intentionally "impeded the police's ability to find him for surveillance." (*Crosby*, *supra*, at p. 794.)

## IV. Application to Present Case

In the briefs filed in this court, petitioner does not take issue with the distinction that has been drawn in *Carmony II*, *supra*, 127 Cal.App.4th 1066, *Gonzalez*, *supra*, 551 F.3d 875, *Nichols*, *supra*, 176 Cal.App.4th 428, and *Crosby, supra,* 678 F.3d. 784, between two categories of defendants who, these cases hold, may properly be treated differently for cruel and unusual punishment purposes. Thus, on the one hand, these decisions conclude that a 25-year-to-life sentence under the Three Strikes law is constitutional as applied to a defendant whose current address is unknown to law enforcement authorities and who has failed to comply with a crucial aspect of the sex offender registration requirements — such as a defendant's failure to register a current address upon arrival in a jurisdiction. On the other hand, the decisions conclude that such a sentence is unconstitutional as applied to a defendant who has provided law enforcement authorities with accurate information regarding his or her current address and has generally demonstrated a good faith effort to comply with the sex offender registration requirements but who, through a negligent oversight, has failed to affirmatively confirm the continued accuracy of his or her existing registration information by updating the information each year within five working days of his or her birthday.

Indeed, in his opening brief, petitioner explicitly "urges this Court to adopt the reasoning of the Third District [which decided both *Carmony II* and *Nichols*]. The failure to re-register the same address in the same year does not thwart the fundamental purpose of the registration law. It is a purely 'passive, nonviolent, regulatory offense that posed no direct or immediate danger to society.' (*People v. Nichols*, *supra*, 176 Cal.App.4th at p. 435.) On the other hand, registration violations that result in the police not knowing the whereabouts of a sexual

35

offender are sufficiently grave to serve as a trigger crime for a third strike sentence."

In taking this position, of course, petitioner asserts that the present case falls within the former, rather than the latter, category; that is, that the circumstances of his offense are comparable to the circumstances in *Carmony II* and *Gonzalez* rather than to those in *Nichols* and *Crosby*. In support of this position, petitioner relies on the fact that the jury convicted him only of the charge of failing to annually update his registration within five working days of his birthday and acquitted him of the charge of failing to register upon his arrival in the jurisdiction.

In their answer brief, the People directly dispute petitioner's characterization of the factual circumstances underlying the triggering offense, asserting instead that this case "concerns a petitioner who failed to register as a sex offender upon his release from state prison, failed to update his registration annually five months later, and failed to report to his parole agent at any time following his release from state prison." In advancing this position, the People expressly rely upon the trial court's finding at the sentencing hearing that petitioner had not registered as a sex offender upon his release from prison in January 2001. The People assert that the trial court's finding demonstrates that, with regard to the cruel and unusual punishment claim, this case is clearly distinguishable from *Carmony II* and *Gonzalez* and is analogous to *Nichols* and *Crosby*.

Petitioner's reply brief does not respond to the People's reliance upon the trial court's finding at the sentencing hearing, and, in continuing to argue that this case is comparable to *Carmony II* and *Gonzalez*, relies exclusively on the circumstances that the jury convicted petitioner only of the offense of failing to

36

update his registration within five working days of his birthday, and acquitted petitioner of the charge of failing to register on arrival in the jurisdiction.

For the reasons discussed below, we conclude that the circumstances surrounding petitioner's triggering offense distinguish this case from *Carmony II* and *Gonzalez* and are more comparable to *Nichols* and *Crosby*.

First, the fact that the 25-year-to-life sentence at issue in this case was imposed on the basis of petitioner's conviction of the offense of failing to annually update his sex offender registration within five working days of his birthday is not, in itself, sufficient to establish that his cruel and unusual punishment claim is equivalent to the cruel and unusual punishment claims that were sustained in *Carmony II* and *Gonzalez*. None of the United States Supreme Court decisions that has addressed an Eighth Amendment challenge to a lengthy sentence imposed under a recidivist sentencing statute based upon the alleged excessiveness or disproportionality of the sentence has focused upon the name or the elements of the offense of which the defendant was convicted *in the abstract* or upon *the least culpable set of circumstances* that potentially could be subjected to the punishment prescribed by the penal statute in question. Instead, in determining whether a lengthy sentence imposed under a recidivist sentencing statute is unconstitutionally excessive or disproportionate, the governing decisions have looked *to the actual conduct* that the defendant has engaged in and that has resulted in the sentence that the defendant claims constitutes cruel and unusual punishment, determining whether the challenged sentence constitutes cruel and unusual punishment *as applied to the specific circumstances involved in the case at issue.* (See, e.g., *Rummel*, *supra*, 445 U.S. 263 [considering specific value of property underlying defendant's theft offenses]; *Solem*, *supra*, 463 U.S. 277 [same]; *Ewing*, *supra*, 538 U.S. 11 (plur. opn.) [same]; *id.* at p. 35 (dis. opn. of Breyer, J.) [same].) Indeed, petitioner acknowledges in his briefing in this court

37

that the governing high court precedent requires "that the circumstances of the triggering crime be assessed individually and on a case by case basis."

The triggering offense at issue here — failure to annually update one's sex offender registration within five working days of one's birthday — can be committed under a wide range of circumstances. Some defendants — as in *Carmony II* and *Gonzalez* — who have properly registered their current address and whose overall conduct demonstrates a general good faith effort to comply with the sex offender registration requirements may commit this offense through a mere negligent oversight that does not adversely impact the fundamental purpose of the sex offender registration regime. Other defendants, however, may violate this statutory provision by intentionally failing to update their sex offender registration within five working days of their birthday as part of a more general course of conduct that demonstrates a deliberate general unwillingness to comply with the sex offender registration requirements. In analyzing a cruel and unusual punishment challenge to a sentence imposed upon a defendant convicted of this offense, a court may not simply look to the nature of the offense in the abstract, but must take into consideration all of the relevant specific circumstances under which the offense actually was committed.

In some instances, the relevant circumstances relating to the defendant's commission of the offense in question may be clear and undisputed and thus may pose no problem for a court's Eighth Amendment analysis. As the present case illustrates, however, in other instances the facts surrounding the defendant's commission of an offense may be vigorously contested and a general verdict finding the defendant guilty of this offense may not establish the particular circumstances under which the offense was committed.

As petitioner points out, in this case not only was petitioner convicted only of, and sentenced upon, the offense of failing to update his sex offender

registration within five working days of his birthday, but the jury specifically acquitted him of the separate charge of failing to register as a sex offender upon his arrival in Palmdale. Petitioner contends that his acquittal of this separate charge establishes that he had in fact properly registered as a sex offender at the Palmdale address where he was arrested and thus that his conduct was comparable to that of the defendants in *Carmony II* and *Gonzalez*. We disagree.

Petitioner's argument on this point fails to take into account the numerous federal and California decisions that uniformly hold that a jury verdict acquitting a defendant of a charged offense does *not* constitute a finding that the defendant is factually innocent of the offense or establish that any or all of the specific elements of the offense are not true. (See, e.g., *United States v. Watts* (1997) 519 U.S. 148, 155 (*Watts*) [unless specific findings are made, "the jury cannot be said to have 'necessarily rejected' any facts when it returns a general verdict . . ."]; *Dowling v. United States* (1990) 493 U.S. 342, 349; *People v. Towne* (2008) 44 Cal.4th 63, 86 (*Towne*) ["'an acquittal merely establishes the existence of a reasonable doubt as to guilt. Unless specific findings are made, 'the jury cannot be said to have "necessarily rejected" any facts when it returns a general verdict . . . .' "]; *In re Coughlin* (1976) 16 Cal.3d 52, 59 ["[T]he fact of an acquittal establishes only that the trier of fact entertained a reasonable doubt of defendant's guilt"]; *In re Dunham* (1976) 16 Cal.3d 63, 66-67.)

As the summary of the evidence presented at trial set forth above (*ante*, at p. 9) indicates, in challenging the prosecution's case with regard to the charge of failing to register upon arrival in Palmdale, the defense focused upon the recordkeeping and computer skills of the sheriff's department clerk, implying that there might be doubt as to the accuracy of the sex offender registration records kept by the Palmdale sheriff's office and reported to the Department of Justice. The jury's verdict of acquittal may indicate that the jury viewed this line of

39

defense counsel questioning and the clerk's responses to the questioning as raising a reasonable doubt with regard to defendant's guilt of this charge. As the numerous cases cited in the preceding paragraph establish, the jury's general verdict of acquittal does not demonstrate that the jury determined that the evidence established that petitioner had in fact registered as a sex offender upon his release from prison, but only that the jury was of the view that the prosecution had not proved the elements of the charged offense beyond a reasonable doubt.

Although the jury in this case made no specific factual findings with regard to whether petitioner had registered as a sex offender upon his arrival in Palmdale in January 2001 after his release from prison, as noted above (*ante*, at pp. 11-12), at the sentencing hearing in this matter after petitioner's conviction, the trial court did indicate its view with regard to that factual question. With respect to petitioner's testimony at trial that he had registered at the Palmdale sheriff's department upon his release from prison and defense counsel's hypothesis that the paperwork had been lost or not completed, the trial court stated: "I don't know if the jury accepted that testimony or not, *but the court did not believe that testimony for a moment*. So my review of [the] evidence supports the fact that the only time that the defendant ever made an effort to register was either when he was in prison for a parole violation, or was taken to register by his parole agent. The defendant is well aware of his obligation to register. He had been told about it on a number of occasions. He is the one that chose to risk the sanctions for having failed to register." (Italics added.) The trial court relied upon its finding that petitioner had intentionally failed to register in declining to strike any of petitioner's prior convictions and imposing a 25-year-to-life sentence under the Three Strikes law, specifically distinguishing the facts of this case from the facts involved in *People v. Cluff*, *supra*, 87 Cal.App.4th 991. In *Cluff*, the Court of Appeal found that the trial court had abused its discretion in failing to strike prior convictions so as to

40

avoid a third strike sentence in a case in which the defendant had properly registered his current address but had negligently failed to update his registration within five working days of his birthday.

As noted, the People contend that in evaluating petitioner's cruel and unusual punishment claim this court may and should properly rely upon the trial court's finding with regard to the circumstances underlying petitioner's offense, and that, under the reasoning of *Nichols*, *supra*, 176 Cal.App.4th 428, and *People v. Meeks*, *supra*, 123 Cal.App.4th 695, this court should reject petitioner's Eighth Amendment challenge because petitioner, by intentionally failing to register and to provide law enforcement authorities with his current residential address, engaged in felonious conduct that was directly and substantially related to the antirecidivist purpose of the Three Strikes law.

To our knowledge, no prior decision has considered the question whether, in analyzing a claim that a sentence constitutes cruel and unusual punishment under the Eighth Amendment, a court may rely upon a factual finding regarding the circumstances relating to the offense that is made by a trial court in the course of a sentencing hearing.**16**  For the reasons that follow, we conclude that it is

---

**16**     In *Gonzalez*, *supra*, 551 F.3d 875, as in the present case, the jury convicted the defendant of failing to annually update his sex offender registration within five working days of his birthday but acquitted him of failing to register upon a change of address.  In addressing the defendant's Eighth Amendment claim, the court in *Gonzalez* noted that the jury had acquitted the defendant of the failure-to-register-on-change-of-address charge, and then stated that "we adopt the jury's implicit determination that Gonzalez was living at his registered address throughout the relevant time period in this case."  (*Gonzalez, supra,* 551 F.3d at p. 884.)

     In relying upon the jury's acquittal in that manner, the court in *Gonzalez* did not consider the United States Supreme Court decisions, discussed above (*ante*, at p. 39), that explicitly hold that, unless the jury makes specific findings, "the jury cannot be said to have 'necessarily rejected' any facts when it returns a general verdict."  (*Watts*, *supra*, 519 U.S. at p. 155; see, e.g., *Dowling v. United*

*(footnote continued on next page)*

41

appropriate to rely upon such a trial court factual finding in deciding whether a sentence that has been imposed in a particular case constitutes cruel and unusual punishment in violation of the Eighth Amendment.

As already noted, although the People relied upon the trial court's findings regarding the circumstances of the offense in their answer brief, petitioner did not discuss the effect of the trial court's findings in his reply brief. Prior to oral argument, we specifically directed the parties to be prepared at oral argument to discuss the question "whether a trial court's factual finding at a sentencing hearing regarding the circumstances relating to a petitioner's triggering offense may affect the determination whether a sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment of the federal Constitution." In response, petitioner's counsel advised the court that at oral argument she would rely upon the case of *People v. Coelho* (2001) 89 Cal.App.4th 861 (*Coelho*) in addressing the court's question. At oral argument, petitioner's counsel maintained that in evaluating an Eighth Amendment challenge to a sentence a court may only consider circumstances of the triggering offense that *the jury* has expressly found to be true beyond a reasonable doubt or that the trial court can determine from the record that *the jury* must have found true beyond a reasonable doubt, arguing that, as in *Coelho*, this requirement followed from the principles underlying a criminal defendant's federal constitutional right to a jury trial as set forth in the line of

---

*(footnote continued from previous page)*

*States*, *supra*, 493 U.S. at p. 349.) Moreover, unlike in the present case, in *Gonzalez* there is no indication that the trial court made any specific finding regarding the circumstances of the offense at the sentencing hearing or at any other time. Thus, the *Gonzalez* court had no occasion to address the legal issue that is before us in this case.

42

United States Supreme Court decisions beginning with *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*).[17]

In *Coelho*, *supra*, 89 Cal.App.4th 861, the Court of Appeal, relying upon the principles underlying the *Apprendi* line of decisions, concluded that the provision of the Three Strikes law that *requires* a trial court to impose a *consecutive* Three Strikes sentence for each current offense of which a defendant is convicted that is "not committed on the same occasion, and not arising from the same set of operative facts" as another current offense (see §§ 667, subd. (c)(6), (7), 1170.12, subd. (a)(6)(7)) should be interpreted to require a trial court to impose consecutive sentences only where the jury expressly found (or, in light of the record, must have found) beyond a reasonable doubt that its separate convictions were based on offenses that were not committed on the same occasion and did not arise from the same set of operative facts. (*Coelho, supra,* 89 Cal.App.4th at pp. 874-884.) In the absence of such an explicit or implied jury finding, the court in *Coelho* held, a trial court is not *required* to impose consecutive Three Strike sentences, and must exercise its ordinary discretion in determining whether to impose consecutive or concurrent sentences. (*Id*. at pp. 884-886.)[18]

---

[17] Because the People relied upon the trial court's findings in their answer brief, petitioner could and should have raised any objection to a reliance upon the trial court's findings, including an objection based upon *Apprendi*, in his reply brief. Accordingly, the provisions of Government Code section 68081 were fully complied with.

[18] The Court of Appeal decision in *Coelho, supra,* 89 Cal.App.4th 861, preceded the United States Supreme Court decision in *Oregon v. Ice* (2009) 555 U.S. 160, where the high court held the *Apprendi* line of decisions does not apply to factual findings that bear on the question whether multiple sentences are to be imposed consecutively or concurrently. Because the issue is not presented here,

*(footnote continued on next page)*

As we explain, the Court of Appeal's decision in *Coelho, supra*, 89 Cal.App.4th 861, is inapposite because the *Apprendi* line of decisions does not apply to the present context. Both the United States Supreme Court and this court have expressly held that a trial court, in exercising its discretion in sentencing a defendant on an offense of which he or she has been convicted, may take into account the court's own factual findings with regard to the defendant's conduct related to an offense of which the defendant has been acquitted, so long as the trial court properly finds that the evidence establishes such conduct by a preponderance of the evidence. (See, e.g., *Watts, supra*, 519 U.S. 148, 155-157; *Towne, supra*, 44 Cal.4th 63, 85-88.) In *Towne*, which was decided after *Apprendi*, we specifically rejected the claim that the trial court's reliance upon its factual findings with regard to a charge of which the defendant had been acquitted by a jury violated the defendant's federal constitutional right to jury trial as established in *Apprendi* and its progeny, explaining that "[p]ermitting a judge to consider evidence of conduct underlying counts of which the defendant was acquitted does not in any way undermine the jury's role in establishing, by its verdict, the maximum authorized sentence." (*Towne, supra*, at p. 87.) And in *United States v. Booker* (2005) 543 U.S. 220, 244-268 (*Booker*), in an opinion by Justice Breyer that expressed the views of a majority of the court on the relevant point, the high court took note of its prior decision in *Watts, supra*, 519 U.S. 148 (*Booker*, at pp. 251-252), and explained that the constitutional principle established by the *Apprendi* line of decisions is not violated by a trial court's own factual findings regarding "the *real conduct* that underlies the [defendant's] criminal conviction" (*Booker*, at p. 250)

*(footnote continued from previous page)*

we express no view on the validity of the holding in *Coelho* in light of the high court's subsequent decision in *Ice*.

so long as, under the applicable statutory scheme, the findings do not *mandate* a particular sentence but leave the trial court free to exercise sentencing discretion. (*Id*. at pp. 259-265.)

In the present case, as in *Towne*, *supra*, 44 Cal.4th 63, the trial court's reliance upon its view of the facts underlying the charge of which petitioner was acquitted, in exercising its discretion not to strike any of petitioner's prior serious or violent felony convictions, did not violate petitioner's constitutional right to jury trial as set forth in *Apprendi* and its progeny. The trial court's finding in this regard did not mandate a particular sentence under the Three Strikes law; the court simply relied upon its factual determination regarding petitioner's course of conduct in exercising the discretion afforded by the Three Strikes statutory scheme in choosing a sentence within the maximum term statutorily authorized by the jury's verdict. (See, e.g., *Southern Union Co. v. United States* (2012) ___ U.S. ___, ___ [183 L.Ed.2d 318, 326] [under *Apprendi*, "judges may exercise discretion in sentencing" so long as they do not " 'inflic[t] punishment that the jury's verdict alone does not allow' "].)

The high court's Eighth Amendment precedents provide no support for a rule that, in a case challenging the constitutional validity of a sentence imposed under a recidivist sentencing statute such as the Three Strikes law, would limit a court's consideration of the actual circumstances of a defendant's offense only to facts that have been found by the jury or proved beyond a reasonable doubt. Inasmuch as the governing federal decisions establish that it is constitutionally permissible for a trial court, applying a preponderance of the evidence standard, to consider the court's own factual findings regarding the real conduct underlying a defendant's conviction in exercising its statutorily authorized discretion in choosing an appropriate sentence (see *Watts*, *supra*, 519 U.S. at p. 157; accord, *Booker*, *supra*, 543 U.S. at p. 261), there is no reasonable basis to suggest that the

45

Eighth Amendment should be interpreted to preclude a court from considering such findings in evaluating a cruel and unusual punishment challenge to that sentence and, instead, to require a trial or appellate court to adopt a factually unrealistic view of the circumstances of the offense when reviewing an Eighth Amendment claim. Indeed, the limitation proposed by petitioner is particularly unpersuasive given the high court's repeated emphasis on the extremely narrow scope of the Eighth Amendment's proportionality principle in this context. (See, e.g., *Ewing*, *supra*, at p. 30 ["Ewing's is not 'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality' "]; *Andrade*, *supra*, 538 U.S. at p. 77 ["The gross disproportionality principle reserves a constitutional violation for only the extraordinary case"]). Accordingly, petitioner's reliance upon *Apprendi* and its progeny is untenable.[19]

---

[19] Contrary to the concurring opinions, we conclude that the prior decisions of the United States Supreme Court and this court that address and explain the scope and limited reach of the *Apprendi* line of cases clearly establish that petitioner's *Apprendi* claim lacks merit. In a case such as this, in which the governing authorities make clear — as Justice Liu's concurring opinion acknowledges (conc. opn. of Liu, J., *post*, p. 3) — that *Apprendi* does not preclude a trial court's findings with regard to the circumstances of an offense from playing a crucial role in determining the sentence that is actually imposed upon the defendant within the statutory range of punishment authorized by the jury's verdict, it is simply illogical, and inconsistent with the high court's reasoning and conclusion in *Ewing*, *supra*, 538 U.S. 11, to maintain that *Apprendi* may or should be interpreted to preclude a court from looking to those trial court findings in comparing, for Eighth Amendment purposes, the gravity of the defendant's criminal conduct with the severity of the punishment imposed. It is worth recalling that it was petitioner's request that the trial court strike several of his prior convictions for purposes of sentencing so as to bring him outside the reach of the Three Strikes law that led to the trial court's finding with respect to the circumstances of the offense. Just as such a trial court finding would be relevant in determining the actual gravity of a defendant's conduct when the finding is favorable to the

*(footnote continued on next page)*

Under California's Three Strikes law, the sentence that is actually imposed upon a defendant in a particular case is dependent not only upon the nature and number of the defendant's prior criminal convictions and whether he or she is convicted in the current prosecution of a felony offense, but also upon the prosecutor's exercise of prosecutorial discretion in determining how many prior convictions to charge in the case. (§§ 667, subd. (f)(2), 1170.12, subd. (d)(2).) In addition, and most significantly for the issue before us in this case, the sentence that is actually imposed under the Three Strikes law is frequently dependent upon the trial court's exercise of discretion in determining whether, in furtherance of

---

*(footnote continued from previous page)*

defendant, logic and fairness dictate that such a finding is similarly relevant when the finding is unfavorable to the defendant. Nothing in *Ewing* or *Harmelin*, *supra*, 501 U.S. 957 provides any support for petitioner's position, and the hypothetical questions posed by Justice Liu's concurring opinion — describing issues not presented by this case — simply ignore the limits on the *Apprendi* line of cases set forth in the controlling precedent.

Furthermore, although Justice Liu's concurring opinion asserts that the court's opinion "does not actually resolve petitioner's *Apprendi* claim" (conc. opn. of Liu, J., *post*, pp. 2, 8), that assertion is simply incorrect. Justice Liu's concurring opinion maintains that "[l]ogically, a rejection of petitioner's claim on the merits must rest on a conclusion (1) that his intentional refusal to register is not a fact essential to the legality of his sentence under the Eighth Amendment or (2) that even if it were such an essential fact, *Apprendi* would not apply." (Conc. opn. of Liu, J., *post*, at pp. 3-4.) But the concurring opinion's effort to reduce our rejection of petitioner's argument to those two alternate conclusions incorrectly frames the issue. We do not have to decide whether petitioner's "intentional refusal to register [is or] is not a fact essential to the legality of his sentence under the Eighth Amendment" in order to resolve petitioner's *Apprendi* claim, because (1) petitioner has conceded that there is no Eighth Amendment violation if his refusal to register was intentional (see, *ante*, pp. 35-36), (2) the trial court found that petitioner's refusal to register was intentional, and (3) this opinion holds that the trial court's finding in this regard may properly be considered in an Eighth Amendment challenge and that such consideration does not violate *Apprendi*. Thus, this opinion fully resolves petitioner's *Apprendi* claim.

47

justice, to strike any of the serious or violent prior convictions that have been charged by the prosecutor and, if so, how many prior convictions to strike. (See generally *People v. Superior Court* (*Romero*), *supra*, 13 Cal.4th 497; *People v. Williams* (1998) 17 Cal.4th 148.) Among the factors that a trial court may properly consider in determining whether to strike a prior conviction under the Three Strikes law are "the nature and circumstances of the defendant's present felonies . . . ." (*People v. Williams*, *supra*, at p. 161.) Accordingly, a trial court's factual determinations with regard to the nature and circumstances of a defendant's triggering offense may play a significant role in determining the sentence that is actually imposed upon the defendant under the Three Strikes law. (See, e.g., *People v. Garcia* (1999) 20 Cal.4th 490, 499 (*Garcia*) ["A court might . . . be justified in striking prior conviction allegations with respect to a relatively minor current felony, while considering those prior convictions with respect to a serious or violent current felony"].)

In light of this statutory scheme, a court that is evaluating whether the sentence that has been imposed upon a defendant under the Three Strikes law constitutes cruel and unusual punishment in violation of the Eighth Amendment must be able to consider and take into account the trial court's factual findings regarding the circumstances related to the triggering offense. In the present case, for example, the trial court's comments distinguishing the facts of the present case from the facts involved in *People v. Cluff*, *supra*, 87 Cal.App.4th 991, suggest that if the trial court had found that petitioner had registered his current Palmdale address upon his release from prison in January 2001 and had simply negligently failed to update that accurate registration within five working days of his May 2001 birthday, the trial court may not have imposed the 25-year-to-life sentence that petitioner now challenges. Thus, in order to understand the actual criminal conduct upon which a sentence that has been imposed under the Three Strikes law

is based, a court, in evaluating a claim of gross disproportionality under the Eighth Amendment, must take into account a trial court's factual findings regarding the circumstances of the triggering offense.

Under section 1385, although a trial court is required to state on the record its reasons for striking a prior conviction (§ 1385, subd. (a)), there is no similar statutory requirement of an on-the-record statement of reasons when a court declines to strike a prior. (See *In re Large* (2007) 41 Cal.4th 538, 550.) But when, as in the present case, a trial court explicitly explains its reasons for declining to strike prior convictions for sentencing purposes, it is appropriate to rely upon the trial court's reasons and findings in evaluating petitioner's Eighth Amendment claim. (Accord, *Carmony I, supra,* 33 Cal.4th at pp. 373, 378-379 [relying upon trial court's statement of reasons in finding that court did not abuse its discretion under § 1385 in declining to strike priors]; *Garcia, supra,* 20 Cal.4th at pp. 494-503 [relying upon trial court's statement of reasons in finding that court did not abuse its discretion in declining to strike priors with respect to one count but in striking priors with respect to a separate count].)

In the present case, in view of the evidence presented at trial, the record is clearly adequate to support the trial court's finding that petitioner failed to register at the Palmdale sheriff's department upon his release from prison in January 2001. As we have seen, the clerk in charge of registering all sex offenders at the Palmdale sheriff's department testified that she was positive that petitioner had not registered in Palmdale, and one of the arresting law enforcement officers testified that, at the time of his arrest, petitioner admitted that he had failed to register upon his release from prison because "he wanted to try to get by through life without contact with the sheriff's department or parole." Further, although petitioner denied making the statement attributed to him by the arresting officer and testified that he had registered in Palmdale upon his release from prison in January 2001

49

and had received a document attesting to that registration which he kept in the nightstand next to his bed, petitioner admitted that, at the time of his arrest, he did not inform the officers that he had in fact registered in the Palmdale sheriff's department or indicate that the documentation of the registration could be found in his nightstand. The arresting officers testified that although other important papers belonging to defendant were found in the nightstand, no documentation of his registration as a sex offender was found there. Finally, in addition to the evidence presented at trial, documentation submitted by the prosecution at the sentencing hearing established that, although he was required to do so, petitioner had failed to contact his parole officer upon his release from prison in January 2001. Under these circumstances, the record is unquestionably adequate to support the trial court's rejection of petitioner's trial testimony that he had registered as a sex offender upon his arrival in Palmdale in January 2001.

In view of the trial court's findings at the sentencing hearing, the circumstances of the triggering offense in this case are clearly distinguishable from the circumstances that underlay the decisions in *Carmony II* and *Gonzalez*. Because the trial court found that petitioner deliberately failed to register as a sex offender even though he knew he had an obligation to do so, petitioner's triggering offense demonstrated that, notwithstanding the significant punishment that he had incurred as a result of his prior serious and violent felony convictions, petitioner was still intentionally unwilling to comply with important legal requirements prescribed by the state's criminal laws. As a consequence, petitioner's current criminal conduct and conviction clearly bore a rational and substantial relationship to the antirecidivist purposes of the Three Strikes law. (Accord, *In re Large, supra,* 41 Cal.4th at p. 552.)

Furthermore, as the United States Supreme Court explained in *Ewing*, *supra*, 538 U.S. 11, in determining the gravity of petitioner's conduct in evaluating

50

an Eighth Amendment challenge to a sentence imposed under a recidivist sentencing statute, we must consider not only petitioner's triggering offense but also the nature and extent of petitioner's criminal history. (*Ewing, supra*, at p. 29 ["In weighing the gravity of Ewing's offense, we must place on the scales not only his current felony, but also his long history of felony recidivism"].) In light of the particularly heinous nature of petitioner's prior criminal activity (see, *ante*, pp. 5-6 & fn. 3), petitioner's present offense ─ reflecting a deliberate decision by petitioner to refuse to comply with an important legal obligation ─ may properly be viewed as an indicator of potentially significant future dangerousness. Taking into account both the circumstances of petitioner's triggering offense and petitioner's very serious criminal history, we conclude that the 25-year-to-life sentence imposed upon petitioner does not constitute cruel and unusual punishment in violation of the Eighth Amendment.

## V. Disposition

The Court of Appeal judgment, denying the petition for habeas corpus, is affirmed.

CANTIL-SAKAUYE, C. J.


**WE CONCUR:**

KENNARD, J.
BAXTER, J.
CHIN, J.
CORRIGAN, J.

**CONCURRING OPINION BY WERDEGAR, J.**


I concur in the majority opinion except for its response to petitioner's belated claim under *Apprendi v. New Jersey* (2000) 530 U.S. 466, which petitioner in my view has forfeited by failing to raise it below. I share Justice Liu's concern that the majority opinion, in choosing to address *Apprendi*'s application to petitioner's sentence, does not fully respond to petitioner's argument. (See conc. opn. of Liu, J., *post*.)


                                        WERDEGAR, J.


1

**CONCURRING OPINION BY LIU, J.**


I join the opinion of the court except for its treatment of petitioner's claim that the Sixth Amendment right to a jury trial, as interpreted by *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and related precedent, constrains our consideration of the circumstances of his triggering offense. (Maj. opn, *ante*, at pp. 42–47.) As explained below, I would not decide the merits of petitioner's claim and instead would deem it forfeited.

Petitioner was charged with two felony offenses: failure to register as a sex offender upon arrival in a jurisdiction and failure to update his sex offender registration within five working days of his birthday. The jury acquitted petitioner of the former offense and convicted him of the latter. Before the sentencing hearing, petitioner asked the trial court to strike at least two of his three prior felony convictions. He relied on the assertedly minor and nonaggravated nature of his conviction for failing to update his registration and argued that, in his case, a 25-year-to-life sentence would constitute cruel and unusual punishment in violation of the Eighth Amendment. In denying this request, the trial court relied in significant part on its finding that petitioner *had* intentionally failed to register upon his arrival in Palmdale, despite the jury's acquittal of petitioner on that count. The trial court subsequently imposed a 25-year-to-life sentence.

1

Petitioner did not object to the trial court's finding or to the trial court's reliance on that finding in denying his request to strike his prior convictions. Nor did petitioner raise an *Apprendi* claim in the Court of Appeal or in any of his briefing in this court — not even after the Attorney General, in her answer brief, cited the trial court's finding as a reason to deny petitioner relief. Only after this court directed the parties to be prepared to discuss at oral argument the significance of the trial court's finding to the Eighth Amendment challenge did petitioner raise his *Apprendi* claim. No lower courts have previously considered the issue. Accordingly, I would reject petitioner's claim as forfeited. (*People v. Heard* (2003) 31 Cal.4th 946, 972, fn. 12.)

Although today's opinion considers the merits of petitioner's *Apprendi* claim, its discussion does not actually resolve that claim despite the court's assertion to the contrary (maj. opn., *ante*, at p. 47, fn. 19). The court says "the *Apprendi* line of decisions does not apply to the present context. Both the United States Supreme Court and this court have expressly held that a trial court, in exercising its discretion in sentencing a defendant on an offense of which he or she has been convicted, may take into account the court's own factual findings with regard to the defendant's conduct related to an offense of which the defendant has been acquitted, so long as the trial court properly finds that the evidence establishes such conduct by a preponderance of the evidence. (See, e.g., [*United States v.*] *Watts* [(1987)] 519 U.S. 148, 155-157; [*People v.*] *Towne* [(2008)] 44 Cal.4th 63, 85–88.)" (Maj. opn., *ante*, at p. 44.) According to the court, "the constitutional principle established by the *Apprendi* line of decisions is not violated by a trial court's own factual findings regarding 'the *real conduct* that underlies the [defendant's] criminal conviction' ([*United States v. Booker* (2005) 543 U.S. 220, 250]) so long as, under the applicable statutory scheme, the findings do not *mandate* a particular sentence but leave the trial court free to exercise

2

sentencing discretion. (*Id*. at pp. 259-265.)" (Maj. opn., *ante*, at pp. 44–45.) These precedents "clearly establish that petitioner's *Apprendi* claim lacks merit," the court says, because the trial court's finding of petitioner's intentional failure to register "did not mandate a particular sentence under the Three Strikes law; the court simply relied upon its factual determination regarding petitioner's course of conduct in exercising the discretion afforded by the Three Strikes statutory scheme in choosing a sentence within the maximum term statutorily authorized by the jury's verdict." (*Id.* at pp. 45, 46, fn. 19.)

The court is undoubtedly correct that under *Watts*, *Towne*, and *Booker*, a trial court may consider its own findings in exercising its sentencing discretion within the maximum term lawfully authorized by the jury's verdict. But those cases did not consider, much less answer, whether *Apprendi*'s requirement of a jury finding applies to a fact essential to the legality of a sentence under the Eighth Amendment. Petitioner's claim is not that *Apprendi* constrains the trial court's sentencing discretion *within* the lawfully authorized range; of course it doesn't. His claim is that *Apprendi* constrains the trial court's sentencing discretion under the Three Strikes law when a 25-year-to-life sentence would *exceed* the lawful maximum — that is, it would violate the Eighth Amendment — *but for the finding of an essential fact*, namely, his intentional failure to register upon his arrival in Palmdale. In *Towne*, we said that *Apprendi* applies " 'to a fact that is "legally essential to the punishment" [citation], that is, to "any fact that exposes a defendant to a greater potential sentence" than is authorized by the jury's verdict alone [citation].' " (*People v. Towne*, *supra*, 44 Cal.4th at p. 86.) That is what petitioner is arguing here: because a 25-year-to-life sentence would be unconstitutional but for a finding that he intentionally refused to register, that finding must be made by a jury beyond a reasonable doubt.

3

Logically, a rejection of petitioner's claim on the merits must rest on a conclusion (1) that his intentional refusal to register is not a fact essential to the legality of his sentence under the Eighth Amendment or (2) that even if it were such an essential fact, *Apprendi* would not apply.

As to the first possibility, the court explains that petitioner's intentional failure to register is a major factor supporting its "conclu[sion] that the circumstances surrounding petitioner's triggering offense distinguish this case from [*People v. Carmony* (2005) 127 Cal.App.4th 1066] and *Gonzalez* [*v. Duncan* (9th Cir. 2008) 551 F.3d 875] and are more comparable to [*People v.*] *Nichols* [(2009) 176 Cal.App.4th 428] and *Crosby* [*v. Schwartz* (9th Cir. 2012) 678 F.3d 784]." (Maj. opn., *ante*, at p. 37; see *id.* at pp. 37–40.)  But the court does not say one way or the other whether the fact of petitioner's intentional failure to register is determinative of the Eighth Amendment issue.  (See *id.* at p. 51 ["Taking into account both the circumstances of petitioner's triggering offense and petitioner's very serious criminal history, we conclude that the 25-year-to-life sentence imposed upon petitioner does not constitute cruel and unusual punishment in violation of the Eighth Amendment."].)

There would be no need to conclude that petitioner's intentional failure to register is *not* a fact essential to the legality of his sentence under the Eighth Amendment if the court were to conclude instead that even if that fact were essential, *Apprendi* still does not apply.  But today's opinion does not say that either, and the issue is not an easy one.

The main argument for *Apprendi*'s inapplicability in this context seems to be that *Apprendi* applies to situations where the facts authorizing a particular sentence are legislatively specified.  (See *Apprendi*, *supra*, 530 U.S. at p. 490 ["Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed *statutory* maximum must be submitted to a jury, and

4

proved beyond a reasonable doubt." (Italics added.)].) In the Eighth Amendment context, by contrast, the facts relevant to the legality of a sentence are specified by a court. It is certainly plausible that the *Apprendi* principle applies only to those facts that a legislature enacting the majority will, and not a court interpreting the Eighth Amendment, deems essential to authorize a particular maximum sentence.

But there are serious counterarguments. In *Ring v. Arizona* (2002) 536 U.S. 584 (*Ring*), the United States Supreme Court held that aggravating factors required for imposition of the death penalty must be found by a jury, not by a judge. Although the aggravating factors in *Ring* were statutorily specified, they were specified by statute only because the high court's Eighth Amendment jurisprudence had required legislatures to specify such factors to distinguish death-eligible from death-ineligible crimes. (See *id.* at p. 606.) Justice Scalia, who has long disagreed with that aspect of the high court's Eighth Amendment jurisprudence, observed that *Ring* posed for him the following "quandary": "Should I continue to apply the last-stated principle when I know that the only reason the fact is essential is that this Court has mistakenly said that the Constitution requires state law to impose such 'aggravating factors'?" (*Id.* at pp. 610–611 (conc. opn. by Scalia, J.).) Justice Scalia resolved his quandary by joining the *Ring* majority in applying *Apprendi*. In light of *Ring*, it is debatable whether the *Apprendi* principle extends not only to statutorily prescribed minimum facts, but also to minimum facts with constitutional origins.

Take another example. The high court in *Enmund v. Florida* (1982) 458 U.S. 782, 797 held that the Eighth Amendment forbids imposition of the death penalty on a defendant "who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (See also *Tison v. Arizona* (1987) 481 U.S. 137, 158 [concluding that "major participation in the felony committed, combined with reckless indifference to human life," satisfied

5

*Enmund*].)  Assume there are three states with the following laws.  The first state, even before *Enmund*, had adopted a statute requiring a finding that a defendant killed, attempted to kill, or intended that a killing occur in order to render the defendant death-eligible.  The second, in response to *Enmund*, enacted an identical statute on the assumption that it was required to do so.  The third enacts no legislation but, under *Enmund*, still may not impose the death penalty on a defendant who did not kill, attempt to kill, or intend a killing occur.  The statutory findings required by the first two states are undoubtedly subject to *Apprendi*.  Can it really be that the same findings in the third state are not, simply because the third state has not implemented *Enmund* through a legislative enactment?  *Ring* emphasized that "the dispositive question . . . 'is one not of form, but of effect.' " (*Ring*, *supra*, 536 U.S. at p. 602, quoting *Apprendi*, *supra*, 530 U.S. at p. 494.) And although *Cabana v. Bullock* (1986) 474 U.S. 376 held that the Sixth Amendment does not require an *Enmund* finding to be made by a jury, that case preceded *Apprendi* and *Ring*.  (See *Ring*, *supra*, 536 U.S. at pp. 598, 609 [finding *Walton v. Arizona* (1990) 497 U.S. 639 "irreconcilable" with *Apprendi* and noting that "*Walton* drew support from *Cabana v. Bullock*"].)

*Booker* also suggests that the applicability of *Apprendi*'s principle is not limited to legislatively prescribed facts that are essential to punishment.  There, the high court considered whether the *Apprendi* principle applied to the federal sentencing guidelines.  The Attorney General argued that *Apprendi* did not apply to the guidelines because, among other reasons, they were promulgated by the United States Sentencing Commission, not by Congress.  (*United States v. Booker*, *supra*, 543 U.S. at p. 237 (*Booker*); see *Mistretta v. United States* (1989) 488 U.S. 361, 368 [U.S. Sentencing Com. is an independent agency located in the federal judicial branch].)  The high court rejected this argument as "lack[ing] constitutional significance."  (*Booker*, at p. 237.)  It was sufficient for purposes of

6

*Apprendi* that the guidelines set forth facts essential to imposing particular sentences. (*Booker*, at p. 238.) "Regardless of whether Congress or a Sentencing Commission concluded that a particular fact must be proved in order to sentence a defendant within a particular range," the fact must be found by a jury beyond a reasonable doubt. (*Ibid.*)

The high court in *Booker* expressly and approvingly noted that its conclusion went beyond the four corners of *Apprendi*: "The Government correctly notes that in *Apprendi* we referred to ' "any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* . . . ." ' Brief for United States 15 (quoting *Apprendi*, 530 U.S., at 490 (emphasis in Brief for United States)). The simple answer, of course, is that we were only considering a statute in that case . . . . [¶] More important than the language used in our holding in *Apprendi* are the principles we sought to vindicate. Those principles are unquestionably applicable to the Guidelines. They are not the product of recent innovations in our jurisprudence, but rather have their genesis in the ideals our constitutional tradition assimilated from the common law. [Citation.] The Framers of the Constitution understood the threat of 'judicial despotism' that could arise from 'arbitrary punishments upon arbitrary convictions' without the benefit of a jury in criminal cases. The Federalist No. 83, p. 499 (C. Rossiter ed. 1961) (A. Hamilton). . . . Regardless of whether the legal basis of the accusation is in a statute or in guidelines promulgated by an independent commission, the principles behind the jury trial right are equally applicable." (*Booker*, *supra*, 543 U.S. at pp. 238–239.) *Booker* further suggests the absence of any bright line limiting *Apprendi*'s applicability to essential facts established by a legislative enactment.

The entirety of the court's discussion of petitioner's *Apprendi* claim is premised on the notion that a 25-year-to-life sentence is a *lawfully authorized* maximum sentence for petitioner's third-strike felony. The court's embrace of

7

that premise is revealed in its statement that "[j]ust as such a trial court finding [concerning the circumstances of the offense] would be relevant in determining the actual gravity of a defendant's conduct when the finding is favorable to the defendant, logic and fairness dictate that such a finding is similarly relevant when the finding is unfavorable to the defendant." (Maj. opn., *ante*, at pp. 46–47, fn. 19.) That statement is only true when a trial court is exercising its discretion to choose a sentence up to and including the lawfully authorized maximum. However, petitioner's *Apprendi* claim fundamentally rests on the proposition that a 25-year-to-life sentence, though authorized by the Three Strikes law, would be *unauthorized* by the Eighth Amendment but for the fact that petitioner intentionally failed to register upon his arrival in Palmdale. Because the court neither disagrees with that proposition nor finds the *Apprendi* principle inapplicable despite that proposition, today's opinion does not actually resolve petitioner's *Apprendi* claim.

In sum, petitioner raised the *Apprendi* claim only at the last minute when prompted to do so by this court. Accordingly, I would reject the claim as forfeited instead of considering it on the merits. In all other respects, I join the opinion of the court.


LIU, J.


8

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Coley

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 187 Cal.App.4th 138
**Rehearing Granted**

_____

**Opinion No.** S185303
**Date Filed:** August 30, 2012

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Dorothy L. Shubin

_____

**Counsel:**

Nancy L. Tetreault, under appointment by the Supreme Court, for Petitioner Willie Clifford Coley.

Michael Vitiello, Patrick Blood and Gary Mandinach for California State Public Defenders Association as Amicus Curiae on behalf of Petitioner Willie Clifford Coley.

Richard Such for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Petitioner Willie Clifford Coley.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lawrence M. Daniels, Victoria B. Wilson, Janet E. Neeley and Noah P. Hill, Deputy Attorneys General, for Respondent State of California.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Nancy L. Tetreault
346 No. Larchmont Blvd., Suite100
Los Angeles, CA  90004
(310) 832-6233

Noah P. Hill
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-8884