Filed 12/10/13  P. v. Farr CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C071306 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F2234) |
| v. | |
| RICHARD STEVEN FARR, | |
| Defendant and Appellant. | |

Pursuant to the "three strikes" law, the trial court sentenced an old and sick child molester to state prison for 25 years to life for failing to register his change of address (Pen. Code, § 290.013) for over six months.  Defendant Richard Steven Farr, 80 years old and wheelchair bound, contends his sentence should shock our conscience and offend fundamental notions of human dignity, rendering it cruel and unusual punishment under

1

both the state and federal Constitutions.  He also argues that the trial court abused its discretion by refusing to strike two of his prior felonies, he was placed twice in jeopardy for the same criminal conduct, and he was denied effective assistance of counsel.

It should go without saying that we are not asked to opine on the wisdom of the three strikes law or mandatory registration requirements for sex offenders, the fiscal consequences of imprisoning an elderly person with health complications, or the role of compassion in sentencing.  These are matters left to the Legislature and the trial court. Given the strong public policies embodied in the sentencing and registration statutes before us, however, we must reject the notion that defendant's age and poor health render his sentence unconstitutional or suggest the trial court abused its discretion by refusing to strike two of his felonies.  Finding that all of the issues raised in this appeal are without merit, we affirm the judgment.

## FACTS

In 1984 defendant was convicted of lewd or lascivious acts with a child under the age of 14 years (Pen. Code, § 288, subd. (a)) and oral copulation of a child under the age of 14 years (Pen. Code, § 288a, subd. (c)).  In 1988 he suffered his third felony conviction, this time for kidnapping.  (Pen. Code, § 207.)  He was aware of his lifetime responsibility to register as a sexual offender, including the obligation to provide updated information within five days of changing his address.  Transients, he knew, were required to update the information about their whereabouts every 30 days.

Defendant enrolled in classes at Shasta College.  Because he was deaf in one ear and had a 70 percent deficit in the other, he was interested in a lipreading class, but he quit after several sessions.  He also talked to the counseling center about registering for a class in computer design but was unable to enroll.

On March 4, 2011, defendant pleaded no contest to failing to register, as required, within five days of his birthday.  He checked in to the Redding Inn on March 5, and on March 8 he gave the Redding Inn as his place of residence to the Redding Police

2

Department.  Before he completed his mandatory registration duties and without checking in with his probation officer, however, he left California for Colorado.

Defendant did not register in Colorado or notify Shasta County of his whereabouts.  He left Colorado for Santa Barbara but did not register when he arrived. He attempted to, but could not, collect his Social Security benefits.

Defendant relocated to Los Angeles and in mid-May 2011 became a resident of Avalon Villa Care Center, a skilled nursing home.  While there, he was free to come and go as he pleased.  There were telephones for him to use as well as mail service.  He lived there for four to five months but did not register with the police as a sex offender or notify Shasta County of his whereabouts.  It was not until he found alternative housing and the operator required him to register that the personnel at Avalon became aware of his status as a sex offender.

At that point, defendant scheduled an appointment with the Los Angeles Police Department.  When he arrived, the detective arrested him on two outstanding warrants from Shasta County.

Defendant had a litany of excuses and a long list of people to blame for his failure to register.  It began on March 4 when, according to defendant, he went immediately to report to the probation department as the judge who accepted his plea asked him to do, but he could not get in the door because there were too many people and everyone was outside.  He purportedly tapped an unnamed probation officer on the shoulder, announced his name and his obligation to report, and informed her he was leaving for Colorado. Because one of his sons had just died and the other was just getting out of prison, he testified he was too "rattled" to fill out the forms completely.

Defendant claims to be the victim of several car accidents.  He was severely injured in an accident in Redding sometime before March of 2011, and the injuries left him unable to walk unassisted.  Then around the 8th or 9th of March, on his way to Colorado Springs to track down his son who had just been released from prison, a big

3

truck hit him and he was hospitalized. He insists he told the nurses he needed to register. Another nameless woman from "some public agency" put him in a halfway house for alcoholics before buying him a bus ticket for Santa Barbara.

In Santa Barbara, he stayed at another rehabilitation facility. He complained that "[t]he SSI people" stopped his Social Security payments because he did not report he was moving from place to place. In Santa Barbara, "I told them that it -- that I had to register and nobody did anything about it for about a couple of weeks." He testified that eventually he went to the police department but was told to come back another day when someone would be there. When he returned he was purportedly told to come back in a week or two. Instead, he left for Los Angeles.

When he arrived in Los Angeles, he went to the Social Security office downtown. He was informed he could not get his payments resumed until he secured an address. En route to securing a place to live, he claims a "car hit me" and he ended up at Avalon Care Center. His story continues. He called the Compton Police Department and was told he could register on Wednesdays between 1:00 and 4:00 p.m. Dutifully, he reported on four consecutive Wednesdays in his wheelchair, yet there was never an officer present during those hours. On his fifth attempt, a lady informed him he should report to the main office in Lynwood.

Although there was no one at the Lynwood office on his first attempt, he claimed he returned a second time and was arrested for failing to register. He testified that he believed people in Colorado had contacted the Shasta County Probation Department and that was the reason he had not registered when he was in Colorado.

**TRIAL COURT FINDINGS**

In *In re Coley* (2012) 55 Cal.4th 524 (*Coley*), the California Supreme Court held that "a court may rely upon a factual finding regarding the circumstances relating to the offense that is made by a trial court in the course of a sentencing hearing" "in deciding whether a sentence that has been imposed in a particular case constitutes cruel and

4

unusual punishment in violation of the Eighth Amendment." (*Coley*, at p. 556.) For this reason we set out the trial court's pertinent findings at some length.

"The probation report describes him in the present tense as a predatory child molester. And there certainly was [*sic*] the standard predatory measures in Plumas County in 1984 and also in 1988 in Redding, the ruse to gain the initial attention and cooperation with the 9- or 10-year-old male victim and efforts to -- and kidnapping in the '84 case. [¶] . . . [¶]

". . . Well, looking at your motion, you indicated that the priors are remote, which I found, with respect to his -- the purposes of impeachment, should he testify, and in fact, he did testify, they are very serious, no question about it. I'm actually going by memory.

"But five, six and seven -- now I have your motion. Here we go. Five, 'Mr. Farr demonstrates a willingness and ability to rehabilitate himself.' I really take issue with that because he absconded from judgment and sentencing, and I concluded -- I heard his trial testimony, of course, as we all did, and the jury, and Mr. Farr demonstrated -- I sincerely believe that the evidence supports the finding that Mr. Farr decided -- he was 78 or 79 -- and he was -- just decided to intentionally no longer comply with the [Penal Code section] 290 registration.

"He didn't want to be encumbered with the stigma of the results of registration with respect to the public notice of or how the 290 registrants lived under Megan's Law. And he wasn't going to participate in sentencing. He was just going to go out and live his remaining years unencumbered by the court process. And he made some bad decisions. He testified to this cascade of events that, through no fault of his own, delayed his registration. And I didn't find his testimony particularly convincing or truthful.

"So that's the problem. He is not someone that is going to follow the requirements of registration. He is, I think, not going to comply with parole, if that ever happens. And he just wants to be by himself. And I have strong reservations.

"I think the probation report is accurate in describing him. Even though he's somewhat frail, still I believe at heart he's a predatory child molester. And I will note that the police report in the 1984 Plumas County, Quincy case noted that one of the victims -- either Allan [B.], who he actually kidnapped and molested, and then Clayton was the boy that was being stalked, in effect, in a public library -- noted that he had a cane, and then there was a notation that that was the result of a 1950 car accident.

"So I think that Mr. Farr has always had some sort of mobility challenge. And to the extent that he's as challenged as he's wheelchair-bound now, I don't know. But I think there is a danger to society, when Mr. Farr gets out, to the youth and with his complying with his legal responsibilities."

The court sentenced defendant under the three strikes law to 25 years to life plus a two-year enhancement because he was on bail or on his own recognizance at the time of the charged offense. The trial court also imposed a consecutive two-year term for another case.

## DISCUSSION

### I

### *Cruel and Unusual Punishment*

Defendant maintains it is cruel and unusual punishment under the federal and state Constitutions to sentence a 78- or 79-year-old man in a wheelchair to state prison for 25 years to life for failing to register as a sex offender.[1] This issue has been fertile ground recently in our court and in the Supreme Court, and the basic principles have been well cultivated. We need only apply those principles, therefore, to the nature and circumstances of defendant's conduct.

---

[1] Defendant testified he was not sure if he was 78 or 79 years old.

In *People v. Meeks* (2004) 123 Cal.App.4th 695 (*Meeks*), we recognized "that sex offenders present a serious danger to society because of their tendency to repeat their sexual offenses. Sexual offenses not only invade the deepest privacies of a human being, and thereby may cause permanent emotional scarring, but they frequently result in serious physical harm to, or death of, the victim. Hence, ' "it is necessary to provide for continued registration" to effectuate the statutory purpose of protecting the safety and general welfare of the public.' [Citation.]" (*Id*. at p. 709.)

Mr. Meeks, even more than defendant, presented a pathetic portrait. At 52 years old, he was dying of AIDS and had been living on the street before moving in with his sister-in-law. (*Meeks*, *supra*, 123 Cal.App.4th at p. 712.) He failed to register because he was consumed by dying. (*Ibid*.) Despite his dire circumstances, in affirming his 25-years-to-life sentence we concluded: "Defendant's willingness to ignore his duty to register and thus ignore society's right to maintain some control over sexual offenders may seem 'de minimis' to him but does not seem so to a society seeking to protect itself from sexual predators. Defendant's history of prior convictions for rape and attempted rape, approximately seven years apart, shows that he is one of those persons who law enforcement needs to have 'readily available for police surveillance at all times.' Here, defendant, without legal excuse or justification, admitted having failed to register after 1997 because he had other 'priorities.' We see nothing 'de minimis' either in the offenses in the abstract or in the circumstances attending their commission." (*Id*. at pp. 709-710.)

The following year we had occasion to consider once again whether punishing a recidivist under the three strikes law to a 25-years-to-life term for failing to register as a sex offender constituted cruel and unusual punishment. (*People v. Carmony* (2005) 127 Cal.App.4th 1066 (*Carmony II*).) Acknowledging that it "is a rare case that violates the prohibition against cruel and/or unusual punishment," we found the "bottom to that well." (*Id*. at p. 1072.) We explained, "If the constitutional prohibition is to have a

7

meaningful application it must prohibit the imposition of a recidivist penalty based on an offense that is no more than a harmless technical violation of a regulatory law." (*Ibid*.)

The key distinction between the facts in *Carmony II* from those in *Meeks* is how the failure to register implicated the very purpose of the mandatory registration requirements. In *Carmony II*, the recidivist had registered his correct address with the police one month before his birthday, but he failed to update the information within five working days of his birthday as required by law. (*Id*. at p. 1071.) His parole agent knew where he resided and knew that the information had not changed, and in fact, Carmony was arrested at the address where he was registered. (*Ibid*.) Because there was no new information to update, he remained at all times "readily available for police surveillance." (*Id*. at p. 1072.)

Since the legislative objective had been achieved, we found the draconian punishment for failing to provide duplicate registration information was "grossly disproportionate to the offense, shocks the conscience of the court and offends notions of human dignity." (*Carmony II*, *supra*, 127 Cal.App.4th at p. 1073.) We concluded the sentence constituted cruel and unusual punishment under both the state and federal Constitutions. (*Ibid*.)

We highlighted the distinction in *People v. Nichols* (2009) 176 Cal.App.4th 428 (*Nichols*). Nichols, like defendant, complied with the registration requirements for some time. He registered when he was released from custody, registered again a month later when he moved, and again, a year later, on his birthday. A month later he registered when he moved again. But he left the area without the permission of his parole agent, met with her supervisor when he decided to return, and was instructed to meet with his parole agent two weeks later. Instead, he jumped on his motorcycle and began drifting around the country for about eight months. A jury resolved a factual dispute about whether or not he had registered against him. (*Id*. at pp. 432-433.)

8

Pointing to the pivotal distinction between the failure to update information on his birthday in *Carmony II* and the failure to register after a change of address in *Meeks*, we observed that "[i]t is this distinction that supports the sentence given in this case. Unlike the failure in *Carmony II*, defendant's failure to register thwarted the fundamental purpose of the registration law, thereby leaving the public at risk." (*Nichols*, *supra*, 176 Cal.App.4th at p. 437.) We explained: "Here, for a period of over eight months, defendant's whereabouts were unknown. Even his federal parole officer did not know where he was. He was drifting around the country and 'hiding out with the hippies.' That is hardly a condition of being readily available for police surveillance. Such blatant disregard of the registration act and complete undercutting of the act's purposes is a serious offense." (*Ibid*.) As in *Meeks*, we concluded Nichols' sustained criminality, the seriousness of his offenses, and thwarting the purpose of the registration requirements demonstrated that his sentence was not grossly disproportionate to his offense. (*Nichols*, at p. 437.)

Although the California Supreme Court rejected the defendant's contention that another 25-years-to-life term constituted cruel and unusual punishment in *Coley*, *supra*, 55 Cal.4th 524, it expressly stated that it did not rest its holding upon a determination that *Carmony II* was wrongly decided (*id*. at p. 530). Thus the rationale we utilized in all three cases remains intact. Nevertheless, *Coley* provides an apt analogy for application of these cases to the facts before us.

Coley, like defendant, testified at trial and offered an account the trial court found incredible. The trial court stated, " 'With respect to the defendant's testimony that he went down to the Palmdale station and registered, and that for some reason the paperwork was lost or not completed, or the registrar failed to input his registration into the computer. I don't know if the jury accepted that testimony or not, *but the court did not believe that testimony for a moment*. So my review of evidence supports the fact that the only time that the defendant ever made an effort to register was either when he was in

9

prison for a parole violation, or was taken to register by his parole agent. The defendant is well aware of his obligation to register. He had been told about it on a number of occasions. He is the one that chose to risk the sanctions for having failed to register.' " (*Coley*, *supra*, 55 Cal.4th at pp. 535-536.)

The jury returned a verdict acquitting Coley of the charge of failing to register upon his arrival in the jurisdiction, but convicting him of failing to update his registration within five working days of his birthday. (*Coley*, *supra*, 55 Cal.4th at p. 535.) With those findings, Coley filed his habeas corpus petition, buoyed by our opinion in *Carmony II*. But the Supreme Court held the jury findings were not dispositive; rather, a court "may rely upon a factual finding regarding the circumstances relating to the offense that is made by a trial court in the course of a sentencing hearing." (*Coley*, at p. 556.)

The trial court found that Coley's intentional failure to register and to provide law enforcement with his current residential address was felonious conduct "directly and substantially related to the antirecidivist purpose of the Three Strikes law." (*Coley*, *supra*, 55 Cal.4th at p. 555.) Thus, like Meeks, Nichols, and defendant, the nature and circumstances of Coley's failure to register thwarted the purpose of the registration requirements to enable police surveillance when necessary. Our high court again highlighted the distinction between circumstances that render a recidivist's sentence grossly disproportionate and those that do not.

"The triggering offense at issue here—failure to annually update one's sex offender registration within five working days of one's birthday—can be committed under a wide range of circumstances. Some defendants—as in *Carmony II* and *Gonzalez*[ *v. Duncan* (9th Cir. 2008) 551 F.3d 875]—who have properly registered their current address and whose overall conduct demonstrates a general good faith effort to comply with the sex offender registration requirements may commit this offense through a mere negligent oversight that does not adversely impact the fundamental purpose of the sex offender registration regime. Other defendants, however, may violate this statutory

10

provision by intentionally failing to update their sex offender registration within five working days of their birthdays as part of a more general course of conduct that demonstrates a deliberate general unwillingness to comply with the sex offender registration requirements.  In analyzing a cruel and unusual punishment challenge to a sentence imposed upon a defendant convicted of this offense, a court may not simply look to the nature of the offense in the abstract, but must take into consideration all of the relevant specific circumstances under which the offense actually was committed." (*Coley*, *supra*, 55 Cal.4th at p. 553.)

The trial court in the instant case, like the trial court in *Coley*, provided a thorough analysis of the relevant "specific circumstances under which the offense actually was committed." (*Coley*, *supra*, 55 Cal.4th at p. 553.)  Most significantly, the court did not find defendant's testimony about the "cascade of events that, through no fault of his own, delayed his registration" either truthful or convincing.  Unlike Carmony, defendant's general course of conduct did not evidence a good faith attempt to comply with the registration requirements.  For over six months, the police were unaware of his whereabouts and unable to monitor his conduct to protect the public.  Thus, as in *Coley*, *Meeks*, and *Nichols*, the very purpose of the registration requirements was thwarted. Defendant's conduct was not a mere "technical violation of a regulatory law" (*Carmony II*, *supra*, 127 Cal.App.4th at p. 1072) so "minor that it cannot trigger the imposition of a recidivist penalty without violating the cruel and/or unusual punishment prohibitions of the United States and California Constitutions" (*Carmony II*, at p. 1071).

Defendant insists that his advanced age and compromised medical condition are circumstances rendering his particular sentence cruel and/or unusual.  We agree that they are circumstances to be considered, but we disagree that they alone render the sentence disproportionate to the gravity of the offense in the context of a recidivist child molester. Indeed, the trial court observed that defendant had been using a cane even at the time he molested and kidnapped young boys and that his reduced mobility would not preclude the

11

commission of future offenses. On appeal, defendant paints the portrait of a feeble old man confined to a wheelchair, nearly deaf, with a poor memory. But as the prosecutor argued to the court below, he showed amazing resourcefulness when he wanted to navigate the system and had no trouble remembering facts and circumstances when it served him well. Since we must consider the trial court's factual findings at sentencing in assessing defendant's constitutional challenge, we conclude neither his age nor his physical condition are determinant factors, and neither render his sentence cruel and/or unusual.

## II

### *Motion to Strike Two Priors*

Clearly, if defendant's three strikes sentence had been cruel or unusual, it would have been an abuse of discretion for the trial court to deny a motion to strike priors. (*People v. Carmony* (2004) 33 Cal.4th 367, 380 (conc. opn. of Moreno, J.) (*Carmony I*).) Having found that his 25-years-to-life term was neither cruel nor unusual, we must now consider whether the trial court abused its discretion by refusing to strike the priors.

Under Penal Code section 1385, subdivision (a), a "judge . . . may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." In *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, our Supreme Court held that a trial court's dismissal of a strike pursuant to section 1385 is reviewable for abuse of discretion. (*Romero*, at p. 531.) In *Carmony I*, *supra*, 33 Cal.4th 367, the court also concluded that "a court's failure to dismiss or strike a prior conviction allegation is subject to review under the deferential abuse of discretion standard." (*Id*. at p. 374.)

The trial court refused to dismiss two of defendant's prior offenses to evade the harsh sentence imposed for a third strike. "[T]he three strikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so. In doing so, the law

creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*Carmony I*, *supra*, 33 Cal.4th at p. 378.)

Thus, it is a rare case where a trial court abuses its discretion by refusing to dismiss a prior offense pursuant to Penal Code section 1385. " '[I]t is not enough to show that reasonable people might disagree about whether to strike one or more' prior conviction allegations. [Citation.] . . . Because the circumstances must be 'extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*Carmony I*, *supra*, 33 Cal.4th at p. 378.)

In *Carmony I*, the Supreme Court found the circumstances "far from extraordinary" (*Carmony I*, *supra*, 33 Cal.4th at p. 378), and those were circumstances far more extraordinary than the ones before us. In reversing our finding that the trial court had abused its discretion by refusing to strike prior offenses, the Supreme Court criticized us for focusing exclusively on a single factor—the nature and circumstances of the current offense—and thereby substituting our judgment for the judgment of the trial court. (*Id*. at p. 379.)

In his opening and reply briefs, defendant reiterates "the cascade of events" that purportedly justified his failure to register. But as we discussed above, the trial court found his testimony untruthful and unconvincing. We cannot say the trial court abused its discretion in rejecting defendant's attempt to cast blame on hospital personnel, public safety officers, social workers, and many others for his failure to register or to justify his belief that he had done all he needed to do.

Moreover, defendant, a recidivist, falls within the spirit of the three strikes law. The trial court went to some length to describe the predatory behavior defendant had

13

exhibited in luring young boys. It is true that since defendant's offenses were committed in the 1980's, they can be considered remote in time. The trial court recognized that the offenses were remote. Nevertheless, the court rejected defense counsel's argument that defendant had demonstrated a willingness and ability to rehabilitate himself. The court stated, "I really take issue with that because he absconded from judgment and sentencing, and I concluded -- I heard his trial testimony, of course, as we all did, and the jury, and Mr. Farr demonstrated -- I sincerely believe that the evidence supports the finding that Mr. Farr decided -- he was 78 or 79 -- and he was -- just decided to intentionally no longer comply with the [Penal Code section] 290 registration."

As noted above, in *Meeks*, *supra*, 123 Cal.App.4th at p. 709 we emphasized "that sex offenders present a serious danger to society because of their tendency to repeat their sexual offenses." We cannot say at what age or with what level of disability an offender loses his desire or ability to reoffend. But as stewards of the law, including both the three strikes law as well as the law requiring offenders to continue to register, we can say the trial court did not abuse its discretion by considering defendant's failure to return for sentencing, followed by a failure to register as he moved around the country and around the state, as serious misconduct jeopardizing public safety and justifying its refusal to strike earlier offenses. Far from a technical violation to update information already known to law enforcement, defendant's cavalier disregard for his legal obligations supports the trial court's decision, and we cannot, and will not, substitute our judgment for that of the trial court.

### III

### *Double Jeopardy and Ineffective Assistance of Counsel*

Wedded to the notion that his failure to register is a trivial, technical offense, defendant contends that his draconian sentence is the " 'tail wagging the dog approach' " alluded to in *Witte v. United State*s (1995) 515 U.S. 389, 403 [132 L.Ed.2d 351] (*Witte*)

14

and violates the constitutional prohibition against double jeopardy. He dilutes the significance of his behavior and misreads *Witte*.

Indeed, the Supreme Court reminded us in *Witte*: "In repeatedly upholding such recidivism statutes, we have rejected double jeopardy challenges because the enhanced punishment imposed for the later offense 'is not to be viewed as either a new jeopardy or additional penalty for the earlier crimes,' but instead as 'a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one.' [Citations.]" (*Witte*, *supra*, 515 U.S. at p. 400.)

Relying on *Witte*, defendant contends that where "the 'enhancing role played by the [prior conviction is] so significant[,] that consideration of that conduct in sentencing has become a "tail which wags the dog of the substantive offense." ' " (Quoting *Witte*, *supra*, 515 U.S. at p. 403.) The court was simply referring to an argument that the petitioner in *Witte* had not made regarding the role of antecedent criminal conduct in a case involving the federal sentencing guidelines where the range fixed by Congress had been extremely broad and the enhancing role of the prior conduct had become extremely significant. *Witte* did not dilute the well-established principle that recidivist statutes do not violate double jeopardy.

Additionally, we reject defendant's characterization of his failure to register as a minor indiscretion for all the reasons we have discussed above. It is simply not the law that the failure to register for a protracted period of time after changing addresses is either minor or technical. While he continues to analogize his own conduct to that of Carmony, we reject the comparison, for as we have explained at length, Carmony's failure to update information law enforcement already had within a few days of his birthday is qualitatively different from failing to notify authorities of a change of address for six months.

Finally, defendant argues his lawyer was constitutionally deficient for failing to object to his 25-years-to-life term as cruel and/or unusual or in violation of the double

15

jeopardy clause.  We have considered both issues on the merits and have found that neither have merit.  As a result, his lawyer has been vindicated and defendant was not denied his constitutional right to effective assistance of counsel.

## DISPOSITION

The judgment is affirmed.


                                                           RAYE            , P. J.



We concur:



              HULL            , J.



              BUTZ            , J.

16